Filed 10/27/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOSEPH NUNEZ et al., | H039910 |
| Plaintiffs and Appellants, | (Santa Cruz County Super. Ct. No. CISCV176366) |
| v. | |
| GIUSEPPE PENNISI et al., | |
| Defendants and Respondents. | |

Joseph Nunez (Nunez) hoped to establish a commercial fishing business so that his son, Edward, could be become a businessman and entrepreneur.  Nunez faced two major obstacles:  Nunez had no prior experience in the fishing industry and the commercial fishing vessel he and his son purchased for $1, the Pioneer, was in need of extensive repair.  So, in addition to hiring a captain, Nunez contracted with Guiseppe Pennisi (Pennisi) to make repairs.

When a dispute arose about the quality of Pennisi's work, Nunez sued for breach of contract, among other claims.  Pennisi filed a cross-complaint alleging Nunez had failed to pay amounts due under the contract.  Edward was added as a party as the case went to trial, as was Pennisi's spouse, Grazia.[1]  Following the Nunezes' opening statement, the trial court granted the Pennisis' motion for nonsuit.  The trial proceeded on the Pennisis' claims.  The jury returned a verdict against the Nunezes and the court entered judgment in favor of the Pennisis.

---

[1] We refer to Edward Nunez and Grazia Pennisi by their first names for purposes of clarity and not out of disrespect.

Subsequently, the Pennisis filed a complaint against the Nunezes and their attorneys alleging they committed the tort of malicious prosecution by filing and pursuing the original claims against the Pennisis. The Nunezes appeal an order denying their Code of Civil Procedure section 425.16[2] (anti-SLAPP) motion to strike the malicious prosecution complaint and awarding $8,315 in attorney fees to the Pennisis.[3]

On appeal, the Nunezes challenge both the denial of their anti-SLAPP motion and the award of attorney fees. We conclude Pennisi has not shown his action against Edward has the minimal merit necessary to avoid being stricken as a SLAPP, nor has Grazia shown a probability of prevailing on the merits against either of the Nunezes. We conclude, however, Pennisi has shown that his malicious prosecution action against Nunez has minimal merit. In doing so, we hold that unless a trial court otherwise specifies, a grant of nonsuit in the underlying case is a "legal termination favorable to the plaintiff" for the purposes of a subsequent malicious prosecution action.

With respect to the order awarding attorney fees, we conclude reversal is required because the order failed to comply with the requirements of sections 425.16, subdivision (c) and 128.5, subdivision (c). For the foregoing reasons, we shall reverse and remand with directions.

I.    FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Pioneer and the Contract*

In July 2008, the Nunezes purchased the Pioneer, a commercial fishing vessel built in 1944, for $1. Having no fishing or boating expertise, they hired Frank Flores to captain the boat. On Flores's recommendation, Nunez hired Pennisi to install a

---

[2] Unspecified statutory references are to the Code of Civil Procedure.

[3] The Nunezes' attorneys in the underlying action were Richard deSaulles and Daniel Cullem. The Pennisis obtained a default judgment against deSaulles for failure to appear. The trial court granted Cullem's anti-SLAPP motion; that order is not at issue in this appeal.

2

refrigeration system. Pennisi operates G&G Engineering and Construction in Monterey, a general contracting business specializing in refrigeration. Pennisi's wife, Grazia, assists him in the business.

Nunez and Pennisi entered into an agreement for the refrigeration work in July 2009. At Nunez's direction, Pennisi contacted a Mexican company, Sirsa Titanium, to design the refrigeration system and fabricate the chillers, evaporators, and condensers. In August 2009, Pennisi learned Sirsa Titanium would provide the chillers in six to eight weeks. He informed Nunez that, as a result, the refrigeration system would not be ready for sardine fishing season. Nunez agreed that, for the upcoming season, his crew could use ice to keep the sardines cold, a common practice in the sardine fishing industry.

Pennisi determined the Pioneer needed additional repairs to be seaworthy. Nunez agreed to pay for the additional work Pennisi recommended and, therefore, Pennisi and his team repaired the boat's pumping and electrical systems.

In September 2009, Pennisi and Nunez signed a contract describing the agreed upon expanded scope of work and setting forth a schedule of payment. The contract stated Nunez had paid $230,000 and owed a balance of $174,945. The schedule of payment provision required a down payment of $60,000 and weekly payments of $50,000 until the balance was paid in full.

The Pioneer went out sardine fishing in mid-September 2009. However, the crew was forced to return to port because of steering problems unrelated to Pennisi's work on the boat. The boat remained docked for the remainder of the month. Pennisi helped repair the steering, which delayed work on the refrigeration system. Between October 7 and October 28, 2009, work was performed on the Pioneer to repair the shaft and to align the engine. Nunez testified that the Pioneer was inoperable in October 2009 because of repairs being performed on the shaft, not because of Pennisi's work on the refrigeration system.

3

The refrigeration system's chillers were installed on November 4, 2009. Pennisi started the refrigeration system in the evening on November 7, 2009. At that time, he was "only able to run one compressor off one generator" because, according to Pennisi, "the generators [Nunez] had purchased were worn out and inefficient, and could not produce steady consistent power." Pennisi "had informed [Nunez] that the generators would have to be replaced," but Nunez had failed to do so despite representing "that he would obtain or purchase new generators."

Gabriel Koch, who worked on the Pioneer's refrigeration system with Pennisi, testified that "the generators were not giving the proper voltage for the [refrigeration] system to stay where it should be to keep the chillers cold so that fish could stay cold."

Ernest Pagan, a commercial fisherman and shipwright, testified that he was on the Pioneer on the night Pennisi started the refrigeration system. Pagan looked at Pennisi's work on the refrigeration system and judged it to be "[a]bsolutely beautiful . . . very professional." According to Pagan, "the generators did not put enough power out . . . [s]o you could not run all four of [the compressors] together. You had to run one at a time, otherwise the system would totally collapse." Pennisi told Pagan he planned to return to the boat the following day to continue working on the refrigeration system.

The next day, November 8, 2009, Pennisi went to work on the Pioneer as usual but it was gone, along with tools belonging to Pennisi and his team. At Nunez's direction, Flores had sailed the boat to Southern California to start squid fishing. According to Pagan, Pennisi was "upset" the boat was gone and "disappointed that he couldn't finish the job." Koch testified that the Pioneer left Monterey for Southern California before they had finished work on the refrigeration system. Because he did not know the boat was leaving and he had more work to do, Koch left approximately $1,000 worth of tools on the boat.

Dennis Leudesiaire, a Pioneer crew member, testified that on the morning the Pioneer left Monterey for Southern California, Flores and Nunez "decided we were going

4

to leave to go down south and they weren't going to wait for [Pennisi] to come back and finish the [refrigeration] system." Leudesiaire testified that, "[a]ccording to [Flores]," Nunez "said F [Pennisi], . . . he ain't going to get his money, we'll have somebody down south in San Pedro take care of the refrigeration." According to Leudesiaire, the refrigeration system "ran," but "you couldn't run the whole system at once" and "it would shut off all the time."

Nunez testified that when he took the boat to Southern California on November 8, 2009, he believed the refrigeration system was working and he did not inform Pennisi of his plans to leave. Nunez further testified at his deposition in the underlying case that he owed Pennisi approximately $111,000 when he took the Pioneer to Southern California.

The refrigeration system did not work properly so, in January 2010, Nunez paid Quality Refrigeration $70,000 to repair the system. According to Nunez, a mechanic at Quality Refrigeration told him Pennisi's prior work on the refrigeration system was inadequate.

Pagan again examined the Pioneer's refrigeration system sometime after the Pioneer sailed to Southern California. At that time it looked to Pagan like "two fish with a pitchfork tried to fix" the system because "somebody [had] chopped all the wires and messed up the harnesses" since the time Pennisi last worked on the system.

### B. The Underlying Lawsuit

Nunez retained an attorney, Richard deSaulles, on a contingent fee basis to sue Pennisi for the allegedly substandard work. On April 7, 2010, Nunez filed a seven count complaint against Pennisi and G&G Engineering and Construction asserting causes of action for fraud, unfair business practices, breach of contract, and accounting. The complaint alleged Nunez had suffered $2.5 million in damages as a result of Pennisi's deficient and untimely work on the Pioneer. While Nunez now contends he never read the complaint, he signed a verification attached to the complaint declaring under penalty of perjury that he had read the complaint, knew its contents, and believed it to be true.

5

Pennisi filed a cross-complaint against Nunez asserting claims for breach of contract, breach of good faith and fair dealing, and goods and services rendered.

Nunez retained a marine engineer, Arthur W. Faherty, to inspect the Pioneer's refrigeration system in February 2010. In a report dated August 1, 2010, Faherty opined that the refrigeration system's design and installation were not consistent with good marine engineering practice; the refrigeration system did not meet the standard of care for marine installation; and the workmanship, in the design and installation of the refrigeration system, did not meet the standard of care for marine installation. Faherty offered no opinion as to whether the refrigeration system's shortcomings were attributable to Pennisi's work. At his deposition, Faherty stated that he did not have, and would not testify to, any opinions other than those stated in his report. DeSaulles designated Faherty as an expert witness and submitted an expert witness declaration stating Faherty would testify "concerning the design, installation, and workmanship of the refrigeration, electrical, and plumbing systems and the work performed on the F/V Pioneer by defendants . . . [and] whether the design, installation and/or workmanship of the defendants . . . met the standards of good marine engineering practice and/or the standard of care."

DeSaulles also designated Steve Hughes, a fishery biologist, as an expert witness. DeSaulles's expert witness declaration stated Hughes "will offer testimony concerning the loss of income suffered by plaintiff Joseph Nunez and the Fishing Vessel Pioneer as a result of the inability of the F/V Pioneer to fish during the period from October 2009 through July 2010, and will testify concerning the present value of said lost earnings of Joseph Nunez and Fishing Vessel Pioneer." In a letter to attorney deSaulles, Hughes opined the Pioneer lost $266,309 in net squid profit between October 1, 2009, and January 6, 2010, and lost $43,107 in net sardine profit during the January 2010 and July 2010 season fishery openings. Hughes wrote that he used the "[d]efined claim periods provide by [deSaulles's] office consisting of the October 1, 2009 to January 6, 2010

6

fishery for market squid and the January and July 2010 season openings of the California sardine fishery." Hughes further wrote that he relied on "[t]elephone discussions with Eddie Nunez and the skipper of the *F/V Pioneer* regarding the periods of lost squid and sardine fishing in 2009 and 2010."

The case proceeded to trial on January 30, 2012. On the first day of trial, Pennisi's counsel requested that Edward be added as a plaintiff and cross-defendant and that Grazia be added as a defendant and cross-complainant. The following day, attorney deSaulles agreed, stating "my clients agree to add [Edward] Nunez in exchange for the addition of Grazia Pennisi." Edward declared, in connection with the anti-SLAPP motion, that he was not present in court that day and was never consulted about being added as a party to the underlying action.

Pennisi had moved in limine before trial to preclude Faherty from offering any undesignated testimony, including as to causation. The court granted the motion and "precluded plaintiffs [(the Nunezes)] from offering undesignated expert witness testimony or opinions as to whether any alleged act, breach, or omission by Defendants caused any cognizable or recoverable damage to Plaintiffs or either of them." Following an Evidence Code section 402 hearing, the court ruled "that Plaintiffs were unable to prove, and precluded from attempting to prove, that Plaintiffs were caused any cognizable damage by reason of any alleged act, breach or omission of Defendants."

Following the Nunezes' opening statement, the Pennisis moved for a judgment of nonsuit under section 581c, subdivision (a). On February 2, 2012, after briefing and argument, the court granted the motion, concluding the Nunezes had not shown their ability "to provide sufficient evidence to set forth the required elements of a prima facie case." Edward was present in court at that time.

The Pennisis' claims were tried to the jury. On February 29, 2012, jurors rendered special verdicts in favor of the Pennisis on their claims for breach of contract, breach of good faith and fair dealing, and goods and services rendered. In particular, the jury found

7

the Pennisis performed under the contract while the Nunezes failed to do so. Jurors found the Pennisis had been damaged in the amount of $101,299, consisting of $71,945.60 in contract damages and $29,353.40 for materials and services provided.

### C. *The Malicious Prosecution Action and Anti-SLAPP Motion*

The Pennisis filed this malicious prosecution action against the Nunezes and their attorneys in the underlying action in Monterey County Superior Court on October 15, 2012. After the case was transferred to Santa Cruz County at the request of one of the defendant attorneys, the Nunezes filed an anti-SLAPP motion.

The trial court denied that motion. The court awarded $8,315 in attorney fees to the Pennisis pursuant to section 425.16, subdivision (c). With respect to attorney fees, the court's written order states only "Defendants Joseph Nunez and Edward Nunez are ordered to pay $8,315.00 in reasonable attorneys [*sic*] fees to Plaintiffs Giuseppe Pennisi II and Grazia Pennisi." At the hearing on the Nunezes' anti-SLAPP motion, the court explained the award of fees was based on its finding that the Nunezes' anti-SLAPP motion was "frivolous" and "the declarations submitted in support of [that] motion include[d] false information." The Nunezes timely appealed.

## II. DISCUSSION

### A. *The Anti-SLAPP Statute*

"[S]ection 425.16 provides a procedure for the early dismissal of what are commonly known as SLAPP suits (strategic lawsuits against public participation)-- litigation of a harassing nature, brought to challenge the exercise of protected free speech rights." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665, fn. 3 (*Fahlen*).) That provision states that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the

8

plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

A motion to strike filed under section 425.16 "is denominated an anti-SLAPP motion." (*Fahlen*, *supra*, 58 Cal.4th at p. 665, fn. 3.) In evaluating such a motion, the trial court must engage in a two-step process. (*Oasis West Realty*, *LLC v*. *Goldman* (2011) 51 Cal.4th 811, 819 (*Oasis West Realty*).) It first determines whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (*Ibid*.) If the defendant makes the requisite showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the claim. (*Id*. at p. 820.) "The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Soukup v*. *Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291 (*Soukup*); *Jarrow Formulas*, *Inc*. *v*. *LaMarche* (2003) 31 Cal.4th 728, 738 ["the anti-SLAPP statute requires only 'a minimum level of legal sufficiency and triability' "].) " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute--i.e., that arises from protected speech or petitioning *and* lacks even minimal merit--is a SLAPP, subject to being stricken under the statute.' " (*Oasis West Realty*, *supra*, at p. 820.)

### B.      Standard of Review

We review the trial court's decision de novo. (*Flatley v*. *Mauro* (2006) 39 Cal.4th 299, 325.) In so doing, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not make credibility determinations or compare the weight of the evidence presented below. Instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.) An anti-SLAPP motion should be granted "if, as a matter of law, the defendant's evidence

9

supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker*, *Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

### C.     Threshold Showing of Protected Activity

The Pennisis' malicious prosecution suit arises from the act of filing the underlying lawsuit, which constituted protected activity, as the filing of lawsuits is an aspect of the First Amendment right to petition. (*Soukup*, *supra*, 39 Cal.4th at p. 291.) Accordingly, as the parties agree, the Nunezes' motion satisfied the first prong of the anti-SLAPP statute and the burden shifted to the Pennisis to demonstrate the probability of prevailing in their action for malicious prosecution.

### D.     Probability of Prevailing on Malicious Prosecution Claim

To establish a probability of prevailing on their malicious prosecution claim, the Pennisis " 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by [them] is credited.' " (*Soukup*, *supra*, 39 Cal.4th at p. 291.) They "need only establish that [their] claim has 'minimal merit.' " (*Ibid.*)

A plaintiff must plead and prove three elements to establish the tort of malicious prosecution: a lawsuit "(1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice." (*Soukup*, *supra*, 39 Cal.4th at p. 292.) We examine each element of the Pennisis' claim in turn. First, however, we address the Nunezes' contention that Grazia lacks standing to bring a malicious prosecution action against them.

#### 1.     Grazia's Standing

"Ordinarily the person who is plaintiff in a malicious prosecution had been the defendant in a prior proceeding which injured him [or her]." (*MacDonald v. Joslyn* (1969) 275 Cal.App.2d 282, 287.) That is precisely the fact pattern at issue here. Grazia

was a defendant in the underlying action. While she was added as a defendant shortly before the court granted nonsuit, the Nunezes cite no authority indicating that deprives her of standing to sue for malicious prosecution. Instead, they largely ignore the fact that Grazia was a party, arguing that "they [(the Nunezes)] would have been unable to execute or collect a judgment against [Grazia]" had they prevailed on their underlying action. But of course that is not true given Grazia was a defendant in that action. Because she was a defendant in the Nunezes' underlying lawsuit, Grazia has standing to sue the Nunezes for malicious prosecution.

### 2. *Edward's Involvement in the Underlying Lawsuit*

According to the Nunezes, the underlying lawsuit was not "commenced by or at the direction of" Edward, such that the Pennisis cannot prevail on a malicious prosecution claim against him.

Liability for malicious prosecution is not limited to one who initiates an action. A person who did not file a complaint may be liable for malicious prosecution if he or she "instigated" the suit or "participated in it at a later time." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 497, pp. 730-731; *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1131, fn. 11 ["A person who is injured by groundless litigation may seek compensation from any person who procures or is actively instrumental in putting the litigation in motion or participates after the institution of the action."].)

Edward was added as a plaintiff in the underlying action based on the agreement of an attorney who arguably purported to represent him ("my clients agree to add [Edward] Nunez"). Edward now says he was not consulted before being made a party to the underlying suit, although there is no evidence he objected to being added as a party when he did appear. Within days of Edward becoming a plaintiff, and shortly after he first appeared in court, the court granted nonsuit in favor of the Pennisis.

11

Generally, a person added as a plaintiff during the pendency of an underlying action is liable for malicious prosecution on the theory that he or she participated in the suit. (See *Paramount General Hospital Co. v. Jay* (1989) 213 Cal.App.3d 360, 365, fn. 2 [party named as a defendant who later "agreed to be bound as if he were a plaintiff" can be liable for malicious prosecution].) Given the showing of "minimal merit" required to defeat an anti-SLAPP motion (*Soukup*, *supra*, 39 Cal.4th at p. 291), evidence Edward was a plaintiff in the underlying action is sufficient to show he participated in the action as required to expose him to malicious prosecution liability.

### 3. Favorable Termination

A lawsuit's termination is favorable to the plaintiff, for purposes of a malicious prosecution action, where it " ' "reflect[s] the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit." ' " (*Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 741.) A technical or procedural termination--such as a dismissal on statute of limitations grounds, pursuant to a settlement, or on the grounds of laches--is not favorable for purposes of a malicious prosecution claim. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 342.)

The Nunezes' underlying action against the Pennisis terminated when the trial court granted nonsuit. The Nunezes maintain that termination was technical, and did not reflect on the merits of their claims, because it was based on their failure to designate an expert to testify as to causation.[4]

We disagree. Section 581c, subdivision (c) provides that where a motion for judgment of nonsuit is granted, "unless the court in its order for judgment otherwise specifies, the judgment of nonsuit operates as an adjudication upon the merits." The

---

[4] As an aside, we note that while the Nunezes imply their experts would have testified as to causation had deSaulles properly designated them as causation experts, there is no evidence showing either expert was prepared to opine as to whether any of Pennisi's acts or omissions caused the Nunezes' damages.

12

order for entry of judgment on nonsuit in the underlying action did not indicate whether the judgment constituted an adjudication on the merits. Thus, the judgment is statutorily deemed to be on the merits and is a favorable termination for purposes of this malicious prosecution action.

We acknowledge that not every judgment of nonsuit should be grounds for a subsequent malicious prosecution action. Some will be purely technical or procedural and will not reflect the merits of the action. In such cases, trial courts should exercise their discretion to specify that the judgment of nonsuit shall not operate as an adjudication upon the merits. But, here, the Nunezes did not lose on some technical ground; they lost because they could not prove an essential element of their case-- causation.

### 4. *Probable Cause*

The second element of a malicious prosecution claim is an underlying action brought without probable cause. Probable cause to bring an action exists where the suit is "*arguably tenable*, i.e., not so completely lacking in apparent merit that no reasonable attorney would have thought the claim tenable." (*Wilson v. Parker, Covert & Chidester, supra*, 28 Cal.4th at p. 824.) "This rather lenient standard for bringing a civil action reflects 'the important public policy of avoiding the chilling of novel or debatable legal claims.' " (*Id*. at p. 817.) In view of that policy, "[o]nly those actions that ' "any reasonable attorney would agree [are] totally and completely without merit" ' may form the basis for a malicious prosecution suit." (*Ibid*.) A litigant lacks probable cause " 'if he [or she] relies upon facts which he [or she] has no reasonable cause to believe to be true, or if he [or she] seeks recovery upon a legal theory which is untenable under the facts known to him [or her].' " (*Drummond v. Desmarais* (2009) 176 Cal.App.4th 439, 453 (*Drummond*).) " 'Where a prior action asserted several grounds for liability, an action for

13

malicious prosecution will lie if any one of those grounds was asserted with malice and without probable cause.' " (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1542.)

The Pennisis contend the Nunezes bear the burden on appeal to demonstrate they had probable cause. Not so. In opposing the Nunezes' anti-SLAPP motion, the Pennisis bore the burden to make a prima facie showing that the Nunezes lacked probable cause. (*HMS Capital*, *Inc*. *v*. *Lawyers Title Co*. (2004) 118 Cal.App.4th 204, 216.) Because the appellate standard of review is de novo, " 'our review is conducted in the same manner as the trial court in considering an anti-SLAPP motion.' " (*Paiva v*. *Nichols* (2008) 168 Cal.App.4th 1007, 1016.) That is, we conduct an independent review of the entire record to determine whether the Pennisis made a prima facie showing of facts necessary to establish their claim at trial, including facts showing the Nunezes lacked probable cause. (*Ibid*.)

The Pennisis presented evidence showing that, in the underlying action, Nunez relied on facts he had no reasonable cause to believe to be true. First, Nunez's underlying complaint alleged Pennisi "unreasonably and without substantial justification abandon[ed]" work on the Pioneer. But Koch, Pagan, and Pennisi testified that Pennisi intended to return to work on the boat but could not because it was gone. Though Nunez testified that "[a]s far as [he] was concerned, . . . [Pennisi] was finished [with his work], and that's why we took the boat," Nunez admitted that he and Flores took the boat without informing Pennisi of their plan to do so. This evidence supports an inference that Nunez knew Pennisi had not abandoned work on the Pioneer as the verified complaint alleged.

Second, the Nunez complaint alleged Pennisi "fail[ed] and refus[ed] to remedy defects" in his work on the Pioneer. The Pennisis submitted evidence establishing Pennisi was not informed of any alleged defects, let alone given the opportunity to remedy them. In particular, Nunez testified he did not tell Pennisi any of his work was "wrong" or needed to be redone. Nunez also testified that he did not tell Pennisi he

14

needed to come back to work on the Pioneer after Flores took the boat to Southern California. Instead, Nunez testified, he planned "to get qualified people to . . . get the work done." This evidence supports an inference that Nunez knew Pennisi never refused to remedy any alleged defects.

Third, Nunez alleged he "fully performed all conditions, covenants, and promises required by him on his part to be performed in accordance with the terms and conditions of the aforesaid written agreement [(the September 2009 contract)]." However, Nunez testified that the September 2009 contract required him to pay Pennisi an outstanding total of $174,945.60, including a down payment of $60,000 and $50,000 per week until the balance was paid off. And Nunez testified that when he took the Pioneer to Southern California in early November he still owed Pennisi $111,000. That evidence shows Nunez knew he had not fully performed his contractual promise to pay.

Finally, Nunez argued in his trial brief that he lost profits for the period between October 1, 2009 to January 6, 2010, because the Pioneer was inoperable due to Pennisi's alleged conduct. But Nunez testified that he knew the Pioneer was inoperable during the month of October 2009 for reasons unrelated to Pennisi's work.

The foregoing evidence submitted by the Pennisis was sufficient to present a prima facie case that Nunez prosecuted the underlying action without probable cause by seeking to recover based on facts he had no reasonable cause to believe to be true.

Nunez argues the Pennisis cannot establish actionable lack of probable cause because he filed the underlying action based on the advice of counsel. "Good faith reliance on the advice of counsel, after truthful disclosure of all the relevant facts, is a complete defense to a malicious prosecution claim." (*Bisno v. Douglas Emmett Realty Fund 1988* (2009) 174 Cal.App.4th 1534, 1544; accord *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 53-54 (*Bertero*).) The burden of proving the advice of counsel defense is on Nunez. (*Bertero*, *supra*, at p. 54.) In his anti-SLAPP motion, Nunez "failed to establish that [he] informed counsel of specific relevant facts prior to the

15

filing of the . . . action" (*ibid.*), including that (1) he did not permit Pennisi to complete his work on the refrigeration system, (2) he did not replace the generators required to run the refrigeration system as Pennisi recommended, (3) Quality Refrigeration performed work on the refrigeration system before Faherty inspected it, and (4) he failed to pay Pennisi money owed under the contract. Therefore, the advice of counsel defense fails.

With respect to Edward, however, the Pennisis failed to carry their burden to make a prima facie showing of lack of probable cause. The Pennisis point us to no evidence indicating Edward had the opportunity to learn the action lacked merit in the short time he was a plaintiff. Nothing in the record demonstrates Edward knew or should have known what the complaint alleged or the legal theories on which the suit relied. Accordingly, the motion to strike the cause of action against Edward should have been granted.

### 5. *Malice*

In the context of the tort of malicious prosecution, malice "refers to an improper *motive* for bringing the prior action." (*Drummond*, *supra*, 176 Cal.App.4th at p. 451.) "[T]he cases speak of malice as being present when a suit is actuated by hostility[,] . . . ill will, or for some purpose other than to secure relief" or where a plaintiff "asserts a claim with *knowledge of its falsity*." (*Id*. at p. 452.) Lack of probable cause, while not sufficient by itself to prove malice, supports an inference of malice. (*Ibid*.)

The Pennisis point to no evidence showing the underlying suit was initiated against Grazia with malice. Rather, the record evidence shows Grazia was made a defendant at the suggestion of her own attorney. The Nunezes merely agreed to that proposal. Because the Nunezes did not affirmatively seek to add Grazia as a defendant, no motive--let alone an improper one--can be imputed to them in connection with her status as a defendant.

With respect to Pennisi, the evidence is insufficient to establish a prima facie case showing that Edward filed the underlying action with malice. Edward did not

16

affirmatively seek to become a party to the underlying action. Rather, he was added at Pennisi's request. There is no evidence, therefore, that he had any motive with respect to formally becoming a party, let alone an improper one.

Pennisi contends Edward acted with malice by misleading one of the experts, Hughes, in order to inflate the Pioneer's alleged lost fishing profits. Hughes determined the relevant time period during which the Pioneer could not fish because of Pennisi's alleged conduct to be October 1, 2009, to January 6, 2010 based on his conversations with Edward, Flores, and deSaulles. In fact, as Nunez and Edward testified, the Pioneer was inoperative for the month of October 2009 for reasons unrelated to Pennisi's work. Pennisi argues Hughes must have included October 2009 in the damages period because Edward intentionally misled him in an attempt to inflate the damages claimed in the underlying suit. But Hughes did not rely solely on his conversations with Edward, but also on information from Flores and deSaulles. Accordingly, the record does not even show Edward was the person who gave Hughes false information, let alone that he did so intentionally because he harbored ill will or hostility toward Pennisi.

By contrast, Pennisi produced evidence sufficient to make a prima facie showing that Nunez filed the underlying action with malice. In particular, Pennisi submitted evidence that, if credited, would show Nunez asserted a breach of contract claim with knowledge of its falsity. As discussed above in the context of probable cause, Nunez's breach of contract claim was based in part on allegations he fulfilled his contractual obligations while Pennisi abandoned his work and refused to remedy defects. But Nunez effectively admitted those allegations were false. Malice could be inferred from Nunez's knowingly false allegations. (See *Albertson v. Raboff* (1956) 46 Cal.2d 375, 383 ["Clearly a person who attempts to establish a claim . . . knowing of its falsity can only be motivated by an improper purpose."]; *Ross v. Kish* (2006) 145 Cal.App.4th 188, 204 [" '[M]alice may still be inferred when a party knowingly brings an action without probable cause.' "].)

17

Moreover, there was some evidence that, if credited, would show the underlying lawsuit was filed for some purpose other than to secure relief. Nunez admitted at trial to taking the Pioneer to Southern California with the belief that the refrigeration system was working properly without paying Pennisi in full or informing Pennisi of his plans to leave. And Pioneer crew member Dennis Leudesiaire testified that, upon deciding to go to Southern California, Nunez "said F [Pennisi], . . . he ain't going to get his money." A jury could infer from that evidence that the underlying lawsuit was brought to avoid paying the balance due on the contract. Indeed, that is precisely what the trial court in the malicious prosecution action concluded, saying "the Nunezes' motive in bringing this action appeared to have been based on the old adage, 'The best defense is a good offense,' in order to avoid an action by Pennisi to recover amounts of money owed to him."

In sum, we conclude Pennisi has shown that his malicious prosecution action against Nunez has, at least, minimal merit. However, Pennisi has not established even minimal merit in his claim against Edward. And Grazia has not established her claim has the requisite minimal merit against either Nunez or Edward.

### E.     Attorney Fees

The Nunezes also appeal the attorney fees awarded to the Pennisis under section 425.16, subdivision (c)(1). That provision states, in relevant part: "If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5." (§ 425.16, subd. (c)(1).) Section 128.5, subdivision (a) authorizes a trial court to "order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." Subdivision (b)(2) of section 128.5 defines "frivolous" as "totally and completely without merit or for the sole purpose of harassing an opposing party." "A motion is

18

totally and completely without merit for purposes of a finding of frivolousness under section 425.16, subdivision (c)(1) or section 128.5 only if any reasonable attorney would agree that the motion is [objectively] totally devoid of merit." (*Chitsazzadeh v. Kramer & Kaslow* (2011) 199 Cal.App.4th 676, 683-684 (*Chitsazzadeh*).) Section 128.5, subdivision (c) requires that an order imposing attorney fees be in writing and "recite in detail the conduct or circumstances justifying the order." "We review a finding under section 425.16, subdivision (c)(1) that a special motion to strike was frivolous or solely intended to cause unnecessary delay for abuse of discretion." (*Chitsazzadeh*, *supra*, at p. 684.)

The Nunezes contend the trial court committed reversible error by failing to recite in detail in its order awarding attorney fees "the conduct or circumstances justifying the order," as required by section 128.5, subdivision (c). As other courts have recognized, by authorizing an award of attorney fees and costs pursuant to section 128.5, section 425.16, subdivision (c)(1) "incorporates the substantive and procedural requirements of section 128.5." (*Chitsazzadeh*, *supra*, 199 Cal.App.4th at p. 683; *Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382, 1392 ["the reference to section 128.5 in section 425.16, subdivision (c) means a court must use the procedures and apply the substantive standards of section 128.5 in deciding whether to award attorney fees under the anti-SLAPP statute"], superseded by statute on other grounds, as stated in *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1349.) Therefore, the court was required to specify in its written order the reasons for the award of attorney fees. Because the order contained no justification for the fees, it "must be reversed with directions to either specify the reasons for the award or deny sanctions." (*Chitsazzadeh*, *supra*, at p. 685; accord *Morin v. Rosenthal* (2004) 122 Cal.App.4th 673, 682-683.)

## III.   DISPOSITION

The order denying the Nunezes' anti-SLAPP motion is reversed and the matter is remanded. On remand, the trial court is ordered to enter a new order (1) denying the anti-

19

SLAPP motion as to Giuseppe Pennisi's malicious prosecution claim against Joseph Nunez, (2) granting the anti-SLAPP motion as to Giuseppe Pennisi's malicious prosecution claim against Edward Nunez, and (3) granting the anti-SLAPP motion as to Grazia Pennisi's malicious prosecution claim against both Joseph and Edward Nunez. The order awarding attorney fees to the Pennisis also is reversed. On remand, the trial court is directed to either enter a new sanctions order in accordance with Code of Civil Procedure sections 425.16, subdivision (c) and 128.5, subdivision (c) or, in the alternative, deny sanctions. The parties shall bear their own costs on appeal.

_____

                               Walsh, J.[*]

WE CONCUR:


_____

        Rushing, P.J.


_____

        Elia, J.


Nunez et al. v. Pennisi et al.
H039910

_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CISCV176366 |
| --- | --- |
| Trial Judge: | Hon. Robert B. Atack |
| Counsel for Appellants/Defendants:<br>Joseph Nunez<br>Edward Nunez | Horan Lloyd<br>James J. Cook<br>Bianca Karim<br>Jennifer Pavlet |
| Counsel for Respondents/Plaintiffs:<br>Giuseppe Giovanni Pennisi<br>Grazia Pennisi | Law Office of David M. Hollingsworth<br>David M. Hollingsworth |

Nunez et al. v. Pennisi et al.
H039910