Filed 2/28/19

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JASON LAKER, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY et al., <br><br> Defendants and Appellants. | H044836 <br> (Santa Clara County <br> Super. Ct. No. 17CV307336) |

Dr. Jason Laker (Laker) sued the Board of Trustees of the California State University (University) and Mary McVey for defamation and retaliation arising from a series of internal investigations conducted by the University.[1] The defendants filed an anti-SLAPP motion[2] to strike the complaint under Code of Civil Procedure section 425.16,[3] which the trial court denied on the ground that the defendants failed to show that Laker's defamation and retaliation claims arose from any activity protected by section

---

[1] McVey was the Associate Dean of the University's College of Education and is still a professor there. In addition to McVey, Laker originally sued three other individuals—Elaine Chin, Andrew Feinstein, and Beth Pugliese—who are or were University employees, but he later voluntarily dismissed his complaint against them with prejudice. Chin, Feinstein, and Pugliese are not parties to this appeal.

[2] An anti-SLAPP motion is "a special motion to strike a 'strategic lawsuit against public participation (SLAPP).' " (*Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767, 773–774.)

[3] All further statutory references are to the Code of Civil Procedure, unless otherwise stated.

425.16.  For the reasons explained below, we agree with the University and McVey that the trial court erred in that finding as to Laker's defamation claim.  However, we affirm the trial court's denial of the University's motion to strike Laker's retaliation claim, although we strike one allegation contained in that claim.

## I.  FACTS AND PROCEDURAL BACKGROUND

We draw the following facts from the pleadings and the supporting declarations submitted in the trial court.  We accept Laker's factual assertions as true for the purpose of resolving whether the trial court erred in its denial of the defendants' special motion to strike.  (See *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).)  Laker is a professor in the University's Department of Counselor Education (Department).  In the summer of 2015, a student approached Laker claiming that the then-Chair of the Department, Dr. Lewis Aptekar (Aptekar), had sexually and racially harassed her.  The student brought a formal Title IX[4] complaint against Aptekar under the University's policies and procedures.[5]  The investigator ultimately concluded that Aptekar had sexually harassed the student.

---

[4] Title IX of the Education Amendments of 1972 (20 U.S.C.A. § 1681 et seq.) (Title IX) forbids sex-based discrimination in all schools, colleges, and universities that receive federal funding. (See 20 U.S.C.A. §§ 1681–1688.)  The Supreme Court has held that "sexual harassment can constitute discrimination on the basis of sex under Title IX." (*Gebser v. Lago Vista Independent School Dist.* (1998) 524 U.S. 274, 283.)

[5] The University's Executive Order 1096 (EO 1096) titled "Systemwide Policy Prohibiting Discrimination, Harassment, Retaliation, Sexual Misconduct, Dating and Domestic Violence, and Stalking against Employees and Third Parties and Systemwide Procedure for Addressing Such Complaints by Employees and Third Parties" states, "[t]he University shall respond promptly and effectively to all complaints of Discrimination, Harassment, Retaliation, Sexual Misconduct, Dating and Domestic Violence, and Stalking, and shall take appropriate action to prevent, correct, and discipline conduct that violates this policy."  In addition, Executive Order 1097 (EO 1097) sets forth policies and procedures for handling discrimination, harassment and retaliation complaints by students and also provides that the University "shall respond promptly and effectively to all complaints of Discrimination, Harassment, and Retaliation."

In a memorandum dated December 21, 2015, the investigator stated that she had "completed the formal investigation of the complaint." Aptekar was disciplined but was allowed to remain the chair of the Department until May 2016. Aptekar was later placed on paid leave and, according to Laker's complaint, the University President made a statement in September 2016 that the University was looking into how the Aptekar matter was handled.

Overall, the parties dispute the propriety, thoroughness, and duration of the Aptekar investigation. Laker claims that the University and certain administrators, including McVey, covered up prior student complaints about Aptekar. In his complaint and in the declaration he submitted to the trial court in connection with the anti-SLAPP motion, Laker stated he had "heard rumors of troubling interactions between Aptekar and multiple students" prior to the summer of 2015, and he had expressed concern to McVey in January 2014 that Aptekar was making students "uncomfortable" and "was lacking in sufficient cultural sensitivity." When Laker later reviewed the draft investigation report made during the Aptekar investigation, he discovered it contained a mischaracterization of his prior communication with McVey, because McVey stated (incorrectly, in Laker's view) that Laker had told her that " 'things would come out' about Aptekar if he became Department Chair."

In any event, there is no dispute that, in February 2016, Beth Pugliese, the Associate Vice President of Human Resources, and certain other University administrators received an e-mail from the student who had originally filed the Title IX complaint against Aptekar. The e-mail was titled "Investigation Outcome Follow-up/Concern" and noted that the "incident and case" related to Dr. Aptekar "has been going on for almost 8 months." In the e-mail, the student stated she was experiencing stress and anxiety from continuing to see Aptekar, who was still the chair of the Department. The student noted that the "process has been very long and drawn out" and "[b]ased on the [investigator's] report, at least two professors were aware of his behaviors

and at least one expressed these concerns to the university." A few days later, Pugliese responded to the student by e-mail. Pugliese's e-mail stated, "As you note, it is concerning that other faculty members, including a previous chair of the department, appear to have received information regarding troubling behavior with other student(s) as early as 2013. Those individuals should have notified appropriate administrators, but they did not." Pugliese's e-mail further noted that "Personnel action against Dr. Aptekar . . . cannot be taken until certain processes are completed as required by law and by the faculty Collective Bargaining Agreement."

In March and April of 2016, the University investigated Laker, as well as other members of the University's faculty, in response to various complaints. As to Laker specifically, three University employees, including Aptekar, made separate complaints pursuant to university regulations. Aptekar claimed that Laker harmed him by "inspiring students to come forward to report sexual and racial harassment by Aptekar." The other complaints were from two different faculty members and related to, respectively, complaints that Laker failed to make breast-feeding accommodations and made intimidating statements.[6]

After exhausting administrative remedies,[7] Laker filed the lawsuit at issue here against the University and several university administrators for defamation and retaliation under the California Fair Employment and Housing Act. As to the defamation claim, Laker alleged he was falsely accused by defendants when they stated that Laker "knew of sexual harassment and failed to report it." He also alleged that McVey and other

_____

[6] Based on the record, it appears the University investigated and closed one complaint against Laker, while the other two complaints remain pending. It does not appear that Laker was ever disciplined over these complaints, and he remains employed by the University.

[7] On September 20, 2016, the University issued a letter notifying Laker that his administrative claim was rejected and that he had six months to file a court action pursuant to Government Code section 945.6. On December 13, 2016, Laker received a "Right to Sue" notice from the Department of Fair Employment and Housing.

University officials called him a "liar" when he said other students had complained of sexual harassment by Aptekar.

As to his retaliation claim, Laker stated that the University and others retaliated against him because he had opposed Aptekar's harassment "and/or" had assisted the student with her complaint against Aptekar. In terms of the means of retaliation, Laker alleged that the defendants retaliated against him by making defamatory statements with the intent of "scapegoating" him for failing to report Aptekar and by causing employees to file against Laker three "meritless Grievances," which the University then investigated. The retaliatory actions caused Laker "emotional distress, including fear, humiliation and chronic anxiety, based on the ongoing scapegoating of Laker." Laker also alleges in his complaint that he was "red flagged" by a university administrator as "someone who should not be allowed to meet with the new [University] President."

The defendants responded to Laker's complaint with an anti-SLAPP motion to strike the complaint in its entirety. They argued that Laker's complaint should be stricken because the defamation and retaliation causes of action arose from protected activity and Laker had no probability of prevailing on either of his two claims. Their motion was accompanied by declarations and exhibits.

McVey submitted a declaration denying she ever made any defamatory statements about Laker. She acknowledged that she "did respond to investigators' questions about Dr. Laker within the context of the Dr. Aptekar matter but [has] not made public negative statements about Dr. Laker." Pugliese also submitted a declaration testifying about her e-mail of February 2016, and disavowing that she had made any defamatory remarks in the e-mail or otherwise about Laker. Pugliese stated "to the extent that I said anything that could be construed as negative about Dr. Laker, I made the statements for the purpose of an investigation regarding Dr. Aptekar's conduct, and my statements would have been entirely limited to San Jose State University administration and investigators who were

5

involved in the investigation.  I have not made any public negative statements about Dr. Laker."

Julie Paisant, the Executive Director of the University's Office for Equal Opportunity and Employee Relations, who was designated to investigate the University's EO 1096 complaints, confirmed that three EO 1096 complaints were filed against Laker "between March and April 2016" and the University "investigated" all three complaints "as required by Article III.A [of EO 1096]."

Laker filed a written opposition to the anti-SLAPP motion and submitted a declaration that largely repeated the allegations in his complaint.  In his declaration Laker stated, "I believe that both McVey and Chin reiterated their defamatory remarks as recently as July and August 2016 when I was communicating to SJSU Provost Andrew Feinstein, attempting to expose their cover-up of the prior reports of sexual misconduct by Aptekar."  Laker also submitted a declaration from Jonathan Karpf, a lecturer at the University.  Karpf's declaration stated that, contrary to what the University claimed, not all EO 1096 complaints had to be investigated.  In Karpf's opinion, the three EO 1096 complaints made against Laker were "highly unusual" and did not meet "the threshold for investigation under EO 1096."  Laker additionally filed in the trial court a request for judicial notice that attached several e-mails between himself and a prosecutor for the Public Integrity Unit of the Office of the District Attorney for Santa Clara County regarding concerns that University administrators (including McVey) had lied to investigators during the Aptekar investigation.[8]

---

[8] In addition, Laker filed numerous written objections to portions of the Declarations of Paisant, Feinstein, and Pugliese.  He did not file any objections to the McVey declaration.

The defendants filed a reply brief, along with an additional declaration from Paisant.[9]  In her second declaration, Paisant stated that the University applied a consistent threshold for EO 1096 complaints, which was also applied consistently to the complaints made against Laker, and that, generally, "[t]he threshold for investigation under Executive Order 1096 is intentionally low because it would be unfair to summarily dismiss an adequately described complaint without at least some probe into the merits of the complaint."

The trial court issued a written order denying the defendants' anti-SLAPP motion. The trial court found that the University and the other defendants had not met their initial burden of showing that the defamation and retaliation causes of action "arise from protected activity."[10]  The University and McVey filed a timely notice of appeal of the trial court's order.

## II.  DISCUSSION

The University and McVey contend that the trial court erroneously concluded that they failed to meet their threshold burden under the anti-SLAPP statute of showing that Laker's defamation and retaliation claims arise from protected activity.  They assert that Laker's defamation claim arises from the protected activity of statements made by McVey and others during the Aptekar investigation, and his retaliation claim arises from the protected activity of the University's investigation of the three complaints against Laker.  Laker counters that the anti-SLAPP statute does not protect any of these activities because the University acted illegally by conducting "sham" investigations; the principal

---

[9] The University also submitted the declaration of Martha Guiditta, a claims examiner for the University, along with Laker's administrative claim form alleging defamation and retaliation with a "Date of Incident" of February 11, 2016.

[10] The trial court also denied Laker's request for judicial notice related to the Santa Clara County District Attorney's Office investigation of purportedly false or misleading statements made by the University, Chin, and McVey related to other complaints against Aptekar as irrelevant and denied both parties' requests for attorney's fees and costs.

e-mail that forms the basis of Laker's defamation claim falls outside the scope of the Aptekar investigation; and the University's decision (which Laker claims constituted retaliation) to pursue three investigations into his own conduct does not meet the test for claims arising from protected activity set out by the California Supreme Court in *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057 (*Park*).)

For the reasons set forth below, we conclude that, with respect to Laker's defamation claim, the University and McVey have met their initial burden under the anti-SLAPP statute of showing that the conduct underlying the allegations in Laker's complaint arises from protected activity. Turning to the merits of Laker's defamation claim, we determine that Laker has failed to show his defamation claim has the requisite merit, because the statements supporting its allegations are absolutely privileged under Civil Code section 47, subdivision (b)(3), which protects statements made in "official proceedings."

The analysis with respect to Laker's retaliation claim is more complex, because the complaint alleges retaliation arising from both protected and unprotected activity. To the extent that Laker's retaliation claim arises from the University's decision to pursue investigations into Laker's own conduct, Laker's claim does not rest on protected conduct. However, Laker's allegation that the University retaliated by publishing false and defamatory statements about him is not merely incidental to his retaliation claim and arises from protected activity. Therefore, it falls within the anti-SLAPP statute. Turning to the merits of this aspect of Laker's retaliation claim, we conclude that the statements supporting this allegation are inadmissible under the absolute litigation privilege. We therefore strike the defamation allegation from Laker's retaliation cause of action.

A. *The Anti-SLAPP Statute*

"We review de novo the grant or denial of any anti-SLAPP motion. We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity." (*Park*, *supra*, 2 Cal.5th at p. 1067.)

8

We consider the pleadings and declarations, accepting as true the evidence that favors the plaintiff and evaluating the defendant's evidence " 'only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321 (*Barry*).)

"The victim of abusive litigation designed to chill the exercise of rights under the First Amendment to the United States Constitution can bring a special motion to strike the so-called SLAPP pursuant to section 425.16 of the Code of Civil Procedure." (*Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176, 1185 (*Nam*).) The statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) If a defendant brings a special motion under the anti-SLAPP statute to strike a cause of action, the trial court evaluates that motion using a two-step process: the first examines the nature of the conduct that underlies the plaintiff's allegations to determine whether the conduct is protected by section 425.16; the second assesses the merits of the plaintiff's claim. (*Barry*, *supra*, 2 Cal.5th at p. 320.)

In the first step of the analysis, the trial court determines whether the cause of action "arises from" an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422 (*Vasquez*).) The first step of the anti-SLAPP analysis "turns on two subsidiary questions: (1) What conduct does the challenged cause of action 'arise[ ] from'; and (2) is that conduct 'protected activity' under the anti-SLAPP statute?" (*Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 698.)

9

The Supreme Court has clarified that "arising from" means "based on." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*).) This element of the first step of the anti-SLAPP analysis is sometimes referred to as the "nexus" requirement. (*Park*, *supra*, 2 Cal.5th at pp. 1060, 1062.) Conduct constitutes "protected activity," if it falls within one of the categories set out in section 425.16, subdivision (e).[11] Section 425.16, subdivision (e), in turn, applies to (1) "any written or oral statement made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law"; (2) "in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"; (3) "in a place open to the public or a public forum in connection with an issue of public interest"; or (4) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subdivision (e).) The defendant bringing the anti-SLAPP motion to strike must make a prima facie showing that the allegations that form the basis of the plaintiff's claims arise from conduct that falls under one of these categories. (*Vasquez*, *supra*, 1 Cal.5th at p. 420.)

If the defendant prevails in this step of the analysis, the trial court must then assess the merits of the plaintiff's claim. The Supreme Court has described this second step of the SLAPP analysis as a "summary-judgment-like procedure." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) The plaintiff carries the burden of demonstrating that its claim has "at least 'minimal merit.' " (*Park*, *supra*, 2 Cal.5th at p. 1061.) If the plaintiff is unable to demonstrate that his or her claim has at least minimal merit, then the trial court should deem the cause of action a SLAPP and should strike it. (*Barry, supra,* 2 Cal.5th at p. 321.)

---

[11] Although these speech and petitioning activities are often referred to as "protected activity," that phrase does not appear in the anti-SLAPP statute. (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 595.)

Here, the trial court concluded that the University and McVey did not make a prima facie showing that their conduct underlying Laker's claims arose from "protected activity." This appeal, therefore, requires us to examine the application of these concepts in detail—and, in particular, to the conduct of the University. We recognize that an unduly broad reading of the anti-SLAPP statute could "become fatal for most harassment, discrimination, and retaliation actions against public employers." (*Nam*, *supra*, 1 Cal.App.5th at p. 1179.) On the other hand, the anti-SLAPP statute should not be interpreted in a manner that would subvert the Legislature's express statement that "it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly." (§ 425.16, subd. (a).) Before turning to the application of section 425.16 to this case, we consider one of Laker's contentions that—if true—would preclude application of the anti-SLAPP statute altogether.

## B. *Illegality*

Laker argues that the four investigations at issue here (the Aptekar investigation and the three investigations into his conduct) were, in various respects, "illegal," because they violated internal university regulations and policies, including EO 1096 and EO 1097, into the standards and timing for investigations, as well as "federal and state laws" including Title IX.[12] Laker states that the investigations were "carried out for cynical and

---

[12] The University and McVey argue that Laker waived his illegality argument by failing to raise it in the trial court. Laker did fail to specify in his opposition to the anti-SLAPP motion the particular argument of illegality he makes here. However, we conclude that Laker did not waive this claim, as the record shows that Laker did question the legality of at least one of the investigations by filing a request in the trial court for judicial notice of certain e-mails between himself and a prosecutor that reference false statements allegedly made by McVey and other administrators during the Aptekar investigation. We deem this action sufficient to preserve for appellate review the question of the legality of the investigations.

illegal reasons and/or carried out in a cynical and illegal manner." Laker also argues that factual assertions made by the University about the investigations into Laker were "contradictory" and "irreconcilable." While the merits and conduct of the investigations may well ultimately prove significant to the success of Laker's suit against the University, the deficiencies that Laker articulates do not arise to the level of illegality that would preclude application of the anti-SLAPP statute.

In *Flatley v. Mauro* (2006) 39 Cal.4th 299, the California Supreme Court held that an attorney's letter constituted criminal extortion as a matter of law and thus was unprotected by the anti-SLAPP statute. More recently, the California Supreme Court has stated, "[w]e made it clear in *Flatley* that conduct must be illegal *as a matter of law* to defeat a defendant's showing of protected activity. The defendant must concede the point, or the evidence conclusively demonstrate it, for a claim of illegality to defeat an anti-SLAPP motion at the first step." (*Vasquez*, *supra*, 1 Cal.5th 409 at p. 424.) The court in *Vasquez* observed that, in that case, the plaintiff's contention that there was an "illegal conflict of interest that infected the councilmember defendants' votes" was vigorously disputed and that the claim of illegality "depend[ed] on inferences to be drawn from circumstantial evidence." (*Ibid*.) Given the disputed nature of the illegality of the defendants' actions, the purported illegality of their conduct did not preclude application of the anti-SLAPP statute. (*Id*. at pp. 424–425.)

As another court has observed, "conduct that would otherwise be protected by the anti-SLAPP statute does not lose its coverage simply because it is alleged to have been unlawful. [Citation.] If that were the test, the anti-SLAPP statute would be meaningless." (*Hansen v. California Dept. of Corrections and Rehabilitation* (2008) 171 Cal.App.4th 1537, 1545 (*Hansen*), italics omitted.)

Contrary to the exceptional circumstances present in *Flatley*, where extortion was found as a matter of law, and consistent with the controverted evidence present in *Vasquez,* the University and McVey have neither conceded that they engaged in any

12

illegal behavior nor that the University violated its own policies and procedures. Laker has likewise not presented evidence that conclusively establishes any illegality as a matter of law.[13] Therefore, we reject Laker's contention that we should affirm the trial court's order based on the illegality of the investigations that are the subject of his complaint.[14]

We turn next to the heart of this appeal—whether the trial court erred when it determined that the University and McVey did not make a prima facie claim that their conduct "ar[ose] from" acts "in furtherance of [their] right of petition or free speech." (§ 425.16, subd. (b)(1).)

C. *Application of the Anti-SLAPP Statute to Laker's Claims*

To demonstrate that the "challenged allegations or claims 'aris[e] from protected activity in which the defendant has engaged" (*Park*, *supra*, 2 Cal.5th at p. 1061, citations omitted), the University and McVey must first make a prima facie showing that their conduct falls within one of the categories set out in section 425.16, subdivision (e). They contend that their actions fall within the first two clauses of section 425.16, subdivision (e) (hereafter § 425.16(e)(1) & (2)), which apply to: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," and "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or

---

[13] We understand Laker's argument related to the contradictions in the University's factual assertions about the investigations into him to be an attack on the legality of the investigations. For the reasons stated here, we reject Laker's contention that the investigations do not qualify as "protected activity" for this reason.

[14] We also reject Laker's argument that the so-called "sham exception to *Noerr-Pennington*" applies here as no such argument was made before the trial court. Furthermore, that exception generally relates to immunity under antitrust and unfair competition law and therefore has no application here. (*BE & K Construction Co. v. National Labor Relations Board* (2002) 536 U.S. 516, 526.)

13

judicial body, or any other official proceeding authorized by law." (§ 425.16(e)(1) & (2).)

The University and McVey must also make a prima face showing that Laker's cause of action *arises from* that protected conduct. The California Supreme Court has clarified the test for determining whether something arises from protected conduct. "[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060.) To determine whether the speech constitutes the wrong itself or is merely evidence of a wrong, "in ruling on an anti-SLAPP motion courts should consider the elements of the challenged claim and what actions by defendant supply those elements and consequently form the basis for liability." (*Id.* at p. 1063.) We address Laker's defamation and retaliation claims separately.

### 1. Defamation

" 'The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.' " (*John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1312; accord, *Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)

#### a. Laker's Factual Allegations

Laker's defamation cause of action centers around statements made by McVey and other University administrators about the Title IX investigation of Aptekar, another professor at the University. As to McVey in particular, Laker alleges that she falsely told the investigator during the course of the Aptekar investigation that Laker was aware of, but failed to report, prior sexual harassment by Aptekar. He also alleges that McVey and other University officials called him a "liar" when he said other students had complained of sexual harassment by Aptekar, but it is not clear when these statements were made. In his declaration, Laker also states that he "believe[s]" that McVey and another University employee "reiterated their defamatory remarks as recently as July and August 2016."

14

With respect to the University, Laker similarly alleges that the University defamed him by claiming that he failed to report Aptekar's prior misconduct. More specifically, he points to the February 2016 e-mail from Pugliese to the student who had initiated the Aptekar investigation, in which Pugliese wrote that "it is concerning that other faculty members, including a previous chair of the department, appear to have received information regarding troubling behavior with other student(s) as early as 2013," and that "[t]hose individuals should have notified appropriate administrators, but they did not."

b. Protected Activity

The University and McVey contend that the statements Laker challenges as defamatory fall within the parameters of section 425.16, subdivision (e)(1) and (e)(2), because they were made in the context of the Aptekar investigation, which constitutes an "official proceeding"—and thus, protected activity—within the meaning of the anti-SLAPP statute.

These first two clauses of subdivision (e) of section 425.16 "safeguard free speech and petition conduct aimed at advancing self government, as well as conduct aimed at more mundane pursuits" and "all that matters is that the First Amendment activity take place in an official proceeding or be made in connection with an issue being reviewed by an official proceeding." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1116 (*Briggs*), internal quotation marks omitted.) A defendant who invokes either subparagraph (1) or subparagraph (2) of subdivision (e) of section 425.16 "need *not* separately demonstrate that the statement concerned an issue of public significance." (*Id.* at p. 1123.)

Other than arguing the entire investigation was a "sham," Laker does not seriously dispute that the Aptekar investigation qualifies as an "official proceeding authorized by law" within the meaning of section 425.16. The California Supreme Court has concluded that this phrase applies to proceedings required by statute. (*Kibler v. Northern Inyo County Local Hospital* (2006) 39 Cal.4th 192, 197.) Here, the University states that its

15

investigation was statutorily authorized by section 89030 of the Education Code, which provides that the University may adopt rules or regulations for the government of their employees, and Laker does not dispute this statutory mandate. Moreover, several courts have found that similar internal investigations were an "official proceeding authorized by law" under section 425.16(e)(1) and (e)(2). (See, e.g., *Hansen*, *supra*, 171 Cal.App.4th at p. 1544; *Guarino v. County of Siskiyou* (2018) 21 Cal.App.5th 1170, 1181.)[15]

In concluding that internal investigations by schools into claims of discrimination qualify as "official proceedings authorized by law" that receive the protections of the anti-SLAPP statute, we also are guided by the express aims of section 425.16(e)(1) & (2), which are to "safeguard free speech and petition conduct aimed at advancing self government." (*Briggs*, *supra*, 19 Cal.4th at p. 1116.) We decline to hold as a matter of law that statements made directly to investigators during an investigation into discrimination (such as the statement Laker alleges McVey made) are not protected under this first step of the anti-SLAPP analysis. Such a conclusion would almost certainly have a chilling effect. Witnesses to allegedly discriminatory conduct might be more reluctant to actively participate and share their candid views and recollections, based on a fear that any statements might later be used in a baseless defamation case against them. Such a chilling effect would in turn thwart the self-government function that the anti-SLAPP statute aims to protect, as well as prevent the University from achieving its mission under EO 1096 and EO 1097 to "effectively" respond to and investigate allegations of

---

[15] The California Supreme Court has granted review of several appellate decisions addressing the relevance of an employer's alleged discriminatory or retaliatory motive in conducting an investigation to determine whether claims arise from protected activity under the anti-SLAPP statute. (*Wilson v. Cable News Network, Inc*., review granted Mar. 1, 2017, S239686; *Bonni v. St. Joseph Health System,* review granted Nov. 1, 2017, S244148; *Melamed v. Cedars-Sinai Medical Center,* review granted Jan. 17, 2018, S245420.) Although Laker does not allege retaliatory intent by the University as to the Aptekar investigation, as discussed below, his retaliation cause of action relating to the internal investigations against him is premised on such an intent.

16

harassment and other forms of discrimination.  Therefore, we conclude that the investigations that are the subject of Laker's complaint are "official proceeding[s] authorized by law" within the meaning of section 425.16, subdivision (e) and consequently are protected conduct.

Laker does not seriously dispute this general proposition.  Instead, he argues, first, that the investigations were "illegal" (an argument we have already rejected) and, second, that certain key statements, such as Pugliese's February 2016 e-mail, were made after the Aptekar investigation had concluded and thus were not made "in connection" with it.  Section 425.16, subdivision (e)(2) "protects only those 'written or oral statement[s] or writing[s] made in connection with an issue under consideration or review.'  The subdivision thus appears to contemplate an ongoing—or, at the very least, immediately pending—official proceeding.  Conversely, if an issue is not presently 'under consideration or review' by such authorized bodies, then no expression—even if related to that issue—could be 'made in connection with an issue under consideration or review. ' "  (*Rand Resources, LLC v. City of Carson* (Feb. 4, 2019, S235735) ___Cal.5th___ [2019 WL 418745 *9] (*Rand Resources*), italics omitted.)

Based on our review of the record, we conclude that the challenged statements were made in connection with the issue of Aptekar's allegedly discriminatory conduct and while that issue was under review.  One of the key statements allegedly made by McVey—that she falsely told the investigator during the course of the Aptekar investigation that Laker was aware of, but failed to report, prior sexual harassment by Aptekar—was made during or in connection with that investigation.  With respect to the February 2016 e-mail, the original e-mail from the student who had filed the complaint against Aptekar had the subject line of "Investigation Outcome Follow-up/Concern," and noted that the "incident and case" related to Dr. Aptekar "has been going on for almost 8 months," and further indicated that the student was continuing to experience "stress" and "anxiety" from continuing to see Dr. Aptekar who remained the department chair at the

17

time. Pugliese's response to that e-mail, which contains the allegedly defamatory remark that "other faculty members, including a previous chair of the department . . . should have notified appropriate administrators, but they did not," also notes that "[p]ersonnel action against Dr. Aptekar, however, cannot be taken until certain processes are completed as required by law and by the faculty Collective Bargaining Agreement." This statement suggests that Aptekar was still being reviewed and investigated. In addition, Laker's own complaint bolsters our conclusion when it alleges that, as late as September 2016, the University was looking at the "handling of Aptekar."

In summary, we conclude that Laker's defamation claim involves protected conduct in the form of statements, including the Pugliese February 2016 e-mail, made during and in connection with issues relating to the ongoing Aptekar investigation.

### c. Arising From Protected Activity

Nevertheless, recognizing that internal investigations constitute "official proceedings" under section 425.16, subdivision (e)(1) and (e)(2)—and thus protected activity—does not resolve whether Laker's defamation claim "arise[s] from" such protected activity. (§ 425.16(b)(1).) "Anti-SLAPP motions may only target claims 'arising from any act of [the defendant] in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . .' (§ 425.16, subd. (b).)" (*Park*, *supra*, 2 Cal. 5th at p. 1062.)

The "arising from" test functionally narrows the scope of the anti-SLAPP statute. Investigations necessarily involve petitions and speech. An unduly broad reading of the anti-SLAPP statute "would subject most, if not all, harassment, discrimination, and retaliation cases to motions to strike. Any employer that initiates an investigation of an employee, whether for lawful or unlawful motives, would be at liberty to claim that its conduct was protected and thereby shift the burden of proof to the employee, who, without the benefit of discovery and with the threat of attorney fees looming, would be

18

obligated to demonstrate the likelihood of prevailing on the merits.  Such a result is at odds with the purpose of the anti-SLAPP law, which was designed to ferret out meritless lawsuits intended to quell the free exercise of First Amendment rights, not to burden victims of discrimination and retaliation with an earlier and heavier burden of proof than other civil litigants and dissuade the exercise of their right to petition for fear of an onerous attorney fee award."[16]  (*Nam*, *supra*, 1 Cal.App.5th at p. 1189.)

Recognizing the potential chilling effects posed by an overbroad reading of the anti-SLAPP statute itself, the Supreme Court has articulated a test to guide courts in determining whether a claim arises from protected activity.  "[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by defendant supply those elements and consequently form the basis for liability." (*Park*, *supra*, 2 Cal.5th 1057 at p. 1063.)  Courts must "take[] care to respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim."  (*Id*. at p. 1064.)

Here, we have little difficulty in finding that the speech alleged in the defamation claim—the statements McVey and others made to investigators during the internal

---

[16] To this end, Amici Curiae Californians Aware, ATIXA, and First Amendment Project, have filed an amicus brief requesting us, among other matters, to hold that "[n]othing the public entity does ought to be regarded as First Amendment activity and no part of its contribution to an official proceeding deserves anti-SLAPP protection." Such a conclusion, however, is foreclosed by precedent from the California Supreme Court.  (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 19 (*Vargas*).) ["[W]e conclude that section 425.16 may not be interpreted to exclude governmental entities and public officials from its potential protection."]  We do not agree with amici that *Park* "implicitly," and without mentioning the case, overruled *Vargas*.  As *Vargas* still constitutes good law, we do not have the authority to disregard it.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  The University and McVey have also requested that we take judicial notice of the briefing made by some of these amici in *Park*, *supra*, 2 Cal.5th 1057.  Concluding that the briefing is not relevant to our decision, we decline to do so.

investigation—are not merely "evidence" of the claim but rather form the basis of Laker's defamation claims against the University and McVey. As reflected in his complaint and declaration opposing the anti-SLAPP motion, these statements and the February 2016 e-mail form the crux of Laker's defamation case. Thus, the protected statements lie at the heart of his defamation claim rather than being merely "incidental" to it. (*Baral*, *supra*, 1 Cal.5th at p. 394.) "What the anti-SLAPP statute protects is speech that 'provides the basis for liability.' " (*Rand Resources*, *supra*, ___Cal.5th___ [WL 418745 at *10].) We are also mindful that, although not every defamation case is subject to the anti-SLAPP statute, defamation claims necessarily involve speech and are therefore more commonly found to be SLAPPs. (See *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1400, fn. 9 [" 'The favored causes of action in SLAPP suits are defamation.' "].)

For these reasons, we find that the trial court erred when it ruled the University and McVey failed to meet their initial burden of showing that Laker's defamation claim arose from protected activity. We turn now to the second step of the anti-SLAPP analysis.

### d. Probability of Success on the Merits

As the trial court concluded that the University and McVey had not met their burden under the first step of the section 425.16 analysis, it did not address the second step of whether Laker could establish a likelihood of success on his claims. In the second step of the anti-SLAPP analysis, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral*,

20

*supra*, 1 Cal.5th at p. 396.)  The plaintiff must demonstrate this probability of success with admissible evidence.  (*Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1162 (*Sheley*).)  "The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.  [Citation.]"  (*City of Costa Mesa v. D'Alessio Investments*, *LLC* (2013) 214 Cal.App.4th 358, 376.)

The University and McVey raise several arguments supporting their view that Laker has failed to carry this burden.[17]  Their principal contention is that Laker cannot prevail on his defamation claim because it relies entirely on statements which are absolutely privileged as they were made "in [an] . . . official proceeding authorized by law."  (Civ. Code, § 47, subd. (b)(3).)  We agree.

The parties dispute who bears the burden of proof on an affirmative defense in the context of an anti-SLAPP motion.  Laker contends that the University and McVey have this burden.  Laker's position is consistent with our own precedent, which we follow here.  (*Nunez v. Pennisi* (2015) 241 Cal.App.4th 861, 876–877.)  While the defendants bear the burden of proof on any affirmative defense, Laker retains the burden to show, under the second step of the anti-SLAPP analysis, that he has a probability of prevailing on the merits of the claim.  (See *Flatley*, *supra*, 39 Cal.4th at p. 321.)

If the challenged action falls within the litigation privilege, the trial court should grant an anti-SLAPP motion to strike.  (See *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1065.)  " 'A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim.'  [Citation.]  The litigation privilege is

---

[17] In addition to the application of the absolute litigation privilege, which we discuss in detail, defendants argue that the statements supporting Laker's defamation allegations are conditionally privileged under Civil Code section 47, subdivision (c).  They also argue that Laker's defamation claim is time-barred, lacks sufficient particularity, fails to allege any special damages, and that McVey is immune under Government Code section 822.2.  Because we determine that the relevant statements are absolutely protected by Civil Code section 47, subdivision (b)(3), we do not reach the merits of these arguments.

defined in Civil Code section 47, subdivision (b) (section 47(b)), and 'precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding.' [Citation.]" (*Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793, 814.)

"Section 47 [of the Civil Code] establishes a privilege that bars liability in tort for the making of certain statements. Pursuant to section 47(b), the privilege bars a civil action for damages for communications made '[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to [statutes governing writs of mandate],' with certain statutory exceptions that do not apply to the present case. The privilege established by this subdivision often is referred to as an 'absolute' privilege, and it bars all tort causes of action except a claim for malicious prosecution." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 360 (*Hagberg*).) "[T]he absolute privilege established by section 47(b) serves the important public policy of assuring free access to the courts and other official proceedings. It is intended to 'assure utmost freedom of communication between citizens and *public authorities whose responsibility is to investigate and remedy wrongdoing*.' " (*Ibid.*) Given these important policy aims, "section 47(b) should be given an expansive reach." (*Id.* at p. 370.)

"The 'official proceeding' privilege has been interpreted broadly to protect communication to or from governmental officials which may precede the initiation of formal proceedings." (*Hagberg*, *supra*, 32 Cal.4th at p. 365, italics omitted.) The University and McVey contend that the privilege attaches to a public entity's internal investigation as an "official proceeding" under Civil Code section 47, subdivision (b)(3). Laker does not question the application of that provision to this case. Rather, Laker argues primarily that the allegedly defamatory statements are not sufficiently connected or "reasonably related" to the Aptekar investigation. However, for the reasons we have

already explained, the Pugliese e-mail was connected to the investigation and is thus also "logically related to the official proceeding." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 219–220.)

Furthermore, the Supreme Court has held that "[i]t is not required that the statement be made during the proceeding itself." (*Hagberg*, *supra*, 32 Cal.4th at p. 368.) The sole case on this point cited by Laker, *Asherman v. Natanson* (1972) 23 Cal.App.3d 861, also does not support his argument that the allegedly defamatory statements had no "reasonable relation" with the Aptekar investigation. In *Asherman*, the court held (albeit in the context of a judicial proceeding rather than an official proceeding) that, for the absolute privilege to apply, "the defamatory matter need not be relevant, pertinent or material to any issue before the tribunal; it need only have some connection or some relation to the judicial proceeding." (*Id*. at p. 865.) There, the court found such a connection between the statement and the proceeding when it held that statements made during a "preliminary interview" related to a hearing on the physician's staff privileges were absolutely privileged. (*Id*. at p. 867.)

Based on these precedents, we conclude that the University and McVey have carried their burden of showing that statements made "in any . . . official proceeding authorized by law," including statements made in connection with the Aptekar investigation at issue in Laker's complaint, are protected by the absolute litigation privilege of Civil Code section 47, subdivision (b)(3). All the evidence that Laker marshals in support of his defamation cause of action falls within this definition and thus is inadmissible. Therefore, Laker cannot demonstrate a probability of success on the merits of his defamation claim.

### 2. Retaliation

Laker alleged that the University unlawfully retaliated against him for opposing "ongoing harassment" being done by Aptekar "and/or" for his "assistance with Student

23

A's complaint of sexual harassment."[18]  To establish a retaliation claim under the California Fair Employment and Housing Act, a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

### a. Laker's Factual Allegations

Laker alleges that the University retaliated against him by making defamatory statements with the intent of "scapegoating" him for failing to report Aptekar and by pursuing three meritless complaints against him.  Laker also alleges that the University decided to "red flag" him, preventing his access to the University President, which restricted his opportunities for promotion.  The retaliatory actions caused Laker "emotional distress, including fear, humiliation and chronic anxiety."  For purposes of this appeal, we accept Laker's factual assertions as true.  (*Park*, *supra*, 2 Cal.5th at p. 1067.)

### b. Protected Activity

For the reasons described above with respect to Laker's defamation claim, the University's investigations into Laker's own conduct qualify as "official proceeding[s] authorized by law" under section 425.16, subdivision (e)(1) and (e)(2).  With the exception of his claim that the investigations were illegal—a contention we have deemed too indeterminate to preclude application of the anti-SLAPP statute—Laker does not seriously contest that these investigations into his own conduct are "official proceeding[s]" to which the anti-SLAPP statute applies.  As to the allegedly defamatory statements he invokes in his retaliation cause of action of being scapegoated, these also appear to be connected to another "official proceeding," that is, the Aptekar investigation.

---

[18] Although other individual defendants were named in the retaliation claim, they have been dismissed from Laker's suit.  Laker did not assert the retaliation cause of action against McVey individually.

24

### c. Arising From Protected Activity

In determining whether the retaliation claim arises from protected acts, we must "consider the elements of the challenged claim and what actions by defendant supply those elements and consequently form the basis for liability." (*Park*, *supra*, 2 Cal.5th at p. 1063.) We must distinguish "between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Id.* at p. 1064.)

When relief is sought based on more than one allegation, some of which arise from activity protected by the anti-SLAPP statute and some of which do not, the allegations that arise from unprotected activity are "disregarded." (*Baral*, *supra*, 1 Cal. 5th at p. 396.) In addition, "[a]llegations of protected activity that merely provide context, without supporting a claim for recovery" are not subject to section 425.16 and "cannot be stricken under the anti-SLAPP statute." (*Baral*, at p. 394.) We look "to whether the claims involving protected activity are merely incidental or collateral to the causes of action as those terms were defined in *Baral*, i.e., whether the allegations are merely background or provide context or whether the allegations support a claim for recovery." (*Sheley*, *supra*, 9 Cal.App.5th at p. 1170.)[19] To determine whether Laker's

[19] The Courts of Appeal are divided on whether, after *Baral*, it is appropriate for courts to disregard allegations that do not constitute the "gravamen" of the plaintiff's cause of action. (See *Area 51*, *supra*, 20 Cal.App.5th at p. 595, fn. 7.) For example, the majority opinion in *Okorie v. Los Angeles Unified School District* (2017) 14 Cal.App.5th 574 (*Okorie*) stated that, at least under some circumstances, "the principal thrust/gravamen analysis remains a viable tool by which to assess whether a plaintiff's claim arises out of protected activity." (*Id.* at p. 590.) In dissent, Justice Rothschild disagreed. "Because *Baral* has eliminated the mixed cause of action problem by redefining a cause of action for purposes of the anti-SLAPP statute, there is no point to ascertaining the gravamen of a mixed cause of action; the 'particular alleged acts giving rise to a claim for relief' are either protected or not. Although, as *Baral* pointed out, a court may need to determine whether factual allegations are incidental to a claim that arises from protected or unprotected activity, determining the gravamen has no place in anti-SLAPP analysis. (See *Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1169.)"

retaliation claim includes allegations that arise from both protected and unprotected activity, we separate his allegations into two categories: first, the University's decisions to pursue the three investigations into Laker and to "red flag" him; and second, the defamatory statements.

### i. *The Investigations and the Red Flag Decision*

Applying the test articulated by the Supreme Court in *Park*, we conclude that Laker's allegation that the University retaliated against him by pursuing three investigations of him arises from unprotected conduct. "[W]hile discrimination may be carried out by means of speech, such as a written notice of termination, and an illicit animus may be evidenced by speech, neither circumstance transforms a discrimination suit to one arising from speech. What gives rise to liability is not that the defendant spoke, but that the defendant denied the plaintiff a benefit, or subjected the plaintiff to a burden, on account of a discriminatory or retaliatory consideration." (*Park*, *supra*, 2 Cal.5th at p. 1066.)

According to the allegations in his complaint, the University subjected Laker to the burden of three meritless investigations and denied him access to the president of the university. While Laker will no doubt need to use speech by university employees as evidence to support his claims, the speech is not—by itself—the basis of the claim. *Park* counsels that this type of conduct does not "aris[e] from any act of that person in furtherance of the person's right of petition or free speech," (§ 425.16, subd. (b)(1)), and therefore does not fall within the protection of the anti-SLAPP statute. (*Park*, *supra*, 2 Cal.5th at p. 1066.) "Acts of governance mandated by law, without more, are not exercises of free speech or petition. '[T]he defendant's act underlying the plaintiff's

---

(*Okorie*, *supra*, 14 Cal.App.5th at p. 601 (dis. opn. of Rothschild, J.), italics omitted.) We agree with the Court of Appeal in *Sheley* and Justice Rothschild's dissent in *Okorie* that *Baral* has eliminated the "gravamen" analysis, and we therefore do not employ it here.

cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]' " (*San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 354.)

The University contends that *Park* held that the "allegations of protected petitioning and speech activity like the investigations here, without any evidence of an adverse employment action, satisfy the first prong of the anti-SLAPP statute." However, *Park* does not contain such a broad holding. Nor did *Park* suggest that all aspects of internal investigations arise out of protected "petitioning activity" for the purpose of the anti-SLAPP statute.

To the contrary, the court in *Park* advised, "Failing to distinguish between the challenged decisions and the speech that leads to them or thereafter expresses them 'would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power.' " (*Park*, *supra*, 2 Cal.5th at p. 1067, citations omitted.) Quoting from an earlier appellate decision, the court noted that, "Any employer who initiates an investigation of an employee, whether for lawful or unlawful motives, would be at liberty to claim that its conduct was protected and thereby shift the burden of proof to the employee who, without the benefit of discovery and with the threat of attorney fees looming, would be obligated to demonstrate the likelihood of prevailing on the merits." (*Ibid.* [quoting *Nam*, *supra*, 1 Cal.App.5th at p. 1189].)

The University also cites a number of appellate cases in support of its claim that Laker's retaliation claim arises out of conduct protected by the anti-SLAPP statute. As we will explain, we find these cases either distinguishable or of limited utility after *Park*.

In *Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574 (*Okorie*), the court addressed a retaliation claim by a teacher who alleged he was subjected to a pretextual internal investigation. (*Id.* at pp. 581–582.) In *Okorie,* speech itself formed the basis of the plaintiff's retaliation claim. Distinguishing *Park*, the court stated, "the speech at issue is explicitly alleged to be the injury-producing conduct." (*Id.*

27

at p. 593.) The court emphasized that the anti-SLAPP statute protected "investigation-related speech allegations—e.g., statements to parents and others about [the plaintiff's] removal from the classroom and repeated demands for the return of LAUSD technology." (*Id*. at p. 594.) Here, by contrast, Laker alleges that the University's decision to pursue the investigations—rather than any particular statement made in the course of that investigation—and its decision to "red flag" him were themselves retaliatory.

The University similarly cites *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387 (*Vergos*) as support for its claim that all aspects of its investigation arise from protected activity. In *Vergos*, the plaintiff claimed that he had been sexually harassed in his employment at the University of California at Davis. He filed a complaint against several individuals and the Regents of the University of California alleging sexual harassment and other claims. (*Id*. at p. 1390.) One of the individual defendants filed an anti-SLAPP motion, which the trial court denied. (*Id*. at p. 1394.) The Court of Appeal reversed. The claim against the Regents was not considered in the *Vergos* decision. (*Id*. at p. 1390.) Instead, the court examined only one of the individual defendant's "statements and communicative conduct in handling plaintiff's grievances (which are the gravamen of plaintiff's civil rights claim against her)." (*Id*. at p. 1394.)

The court concluded that her statements and communicative conduct were protected activity under section 425.16. (*Vergos*, *supra*, 146 Cal.App.4th at p. 1400.) The court in *Vergos* emphasized that it was "deal[ing] with a lawsuit against an individual public employee" and the "gravamen" of the relevant claim was the individual's "communicative conduct in denying plaintiff's grievances." (*Id*. at pp. 1397–1398.) Therefore, *Vergos* does not stand for the proposition the University advances—that its decision to pursue the investigations (rather than any communicative conduct of individual employees)—arises from protected activity. The decision in *Hansen v. California Dept. of Corrections and Rehabilitation* (2008) 171 Cal.App.4th 1537, also cited by the University, is distinguishable for the same reason. (See *id*. at p.

1544 [noting the plaintiff's "complaint [was] based on statements and writings CDCR personnel made during the internal investigation and in securing the search warrant"].)

The University likewise relies on the decision in *Gallanis-Politis v. Medina* (2007) 152 Cal.App.4th 600 (*Gallanis-Politis*). In that case, a Los Angeles County employee sued the County and various individuals for conducting a pretextual investigation in retaliation for her efforts to obtain bilingual bonus pay. (*Id.* at p. 604.) As in *Vergos*, the organizational defendant (in *Gallanis-Politis*, the County) was not a party to the appeal of the trial court's denial of the motion to strike; instead *Gallanis-Politis* considered the application of section 425.16 only to the suit against two individuals. (*Gallanis-Politis*, at p. 604.)

The precise language in *Gallanis-Politis* about why the plaintiff's claims arose from the defendants' protected activity is difficult to parse. The court stated, "no evidence permits a conclusion that the investigation and memorandum upon which [the plaintiff's] retaliation claim against Medina and Ramirez is founded were not acts undertaken in response to counsel's inquiries to Medina which, counsel avers, were made in the course of preparing responses to [the plaintiff's] discovery requests. (See Code Civ. Proc., § 425.16, subd. (e)(2) [an act in furtherance of a person's right of petition or free speech includes 'any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body'].) Thus, Medina and Ramirez made the required threshold showing that [the plaintiff's] cause of action for retaliation arose, at least in significant part, from protected activity." (*Gallanis-Politis*, *supra*, 152 Cal.App.4th at p. 612.) Based upon this language in the decision, we are not convinced that *Gallanis-Politis* stands for the broad proposition that the decision to undertake an investigation itself arises from protected activity. Moreover, *Gallanis-Politis* was decided long before *Park* and is therefore of limited utility in applying the test set out in that case to Laker's claims.

29

Although the text of section 425.16 does not distinguish between claims arising from the protected conduct of individuals from those arising from the protected conduct of governmental entities, we observe that courts appear more likely to find that claims arise out of protected conduct when they are based on the actions of individuals. (See *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 599 [discussing the Supreme Court case of *Vasquez*, *supra*, 1 Cal.5th at p. 425 and noting "[t]he *Vasquez* opinion draws a distinction between, on the one hand, claims seeking to impose liability against a governmental entity, and, on the other, claims seeking to impose liability for the expressive activity of officials through whom a government entity must act"].)

Similarly, a Court of Appeal recently affirmed the denial of an anti-SLAPP motion to strike where a county employee alleged she had been wrongfully placed on administrative leave during an investigation into her conduct because she had revealed that county employees were engaging in illegal activity. (*Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 357.) The court rejected the County's contention that its actions arose from protected activity. "Had plaintiff sued the specific supervisors who conducted the investigation on behalf of the County, a clear case of a SLAPP suit would have been established. But the plaintiff challenged the retaliatory employment decision, not the process that led up to that point." (*Id*. at p. 362.)

The Supreme Court's opinion in *Park* suggests the potential importance of distinguishing between decisions made by entities from the speech of those involved in the decision: "Conflating, in the anti-SLAPP analysis, discriminatory decisions and speech involved in reaching those decisions or evidencing discriminatory animus could render the anti-SLAPP statute 'fatal for most harassment, discrimination and retaliation actions against public employers.' [Citation.]" (*Park*, *supra*, 2 Cal.5th at p. 1067.) The Supreme Court has recently cautioned that, although the anti-SLAPP statute must be read broadly, "we do not understand it to swallow a person's every contact with government." (*Rand Resources*, *supra*, ___Cal.5th___ [WL 418745, at *11.)

We do not assert that the distinction between individual and organizational defendants constitutes a formal element of the anti-SLAPP analysis, for judicial imposition of a statutory requirement not contained in the text of section 425.16 "would violate the foremost rule of statutory construction." (*City of Cotati*, *supra*, 29 Cal.4th at p. 75.) Nevertheless, we observe that many of the cases relied upon by the University involve claims of action asserted against individuals engaging in investigations, rather than claims based on the decisions made by organizational defendants such as the University. The outcome of the "arising under" analysis articulated by the Supreme Court and developed by the Courts of Appeal appears to differ between institutional and individual defendants.

The University also argues that Laker's retaliation claim does not arise from unprotected activity because "no adverse employment action occurred." However, the University cites no case for the proposition that an adverse employment action is a necessary element of the first step of the anti-SLAPP analysis. To the contrary, the *Park* decision notes that the initiation of an investigation can itself constitute abusive conduct unprotected by section 425.16. (*Park*, *supra*, 2 Cal.5th at p. 1067.) Importantly, Laker's retaliation cause of action is premised on his allegation that the University's decision to pursue three "meritless" investigations of Laker was itself conduct in retaliation for actions Laker had previously taken in the Aptekar investigation. According to Laker, the University's investigations into his own conduct was not a good-faith investigation into employee wrongdoing but itself constituted a retaliatory action.

For these reasons, we conclude that the University cannot make a prima facie showing that Laker's retaliation claim, insofar as it is based on the allegations that the University pursued three meritless investigations of him and decided to red flag him, "arise[s] from any act . . . in furtherance of [their] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public

issue." (§ 425.16, subd. (b)(1).) As it relates to these allegations, we affirm the trial court's order denying the University's motion under section 425.16.[20]

### ii. *The Defamatory Statements*

We reach a different conclusion with respect to the defamation allegation contained in Laker's retaliation claim. In paragraph 90(a) of his complaint, Laker alleges that the University retaliated against him by "multiple means" including by "publishing false and defamatory statements about Laker to punish him for his ongoing efforts to protect SJSU students from sexual harassment by Aptekar, with the intent of scapegoating Laker as the person who had failed to report Aptekar's misconduct." Although this allegation references multiple "statements," Laker does not identify any statements as retaliatory other than those he cited in the defamation claim. On this basis, we assume that the defamatory statements described in the retaliation claim are the same as those discussed above in the context of his defamation claim, including Pugliese's February 2016 e-mail.

The defamation allegation is "not merely incidental" to Laker's retaliation claim in that it does more than merely "provide context." (*Baral*, *supra*, 1 Cal.5th at p. 394; *Bel Air Internet*, *LLC v. Morales* (2018) 20 Cal.App.5th 924, 944–945.) This allegation appears as the first item in Laker's list of retaliatory actions taken against him by the University rather than in the background section of his complaint. Furthermore, if Laker could prove this allegation with admissible evidence, it could support his retaliation claim. We have already determined, in our analysis of the defamation cause of action, that the statements Laker identifies as defamatory were part of the protected activity of the Aptekar investigation.

---

[20] Because we affirm the trial court's order, we do not reach Laker's claim that the three investigations into his conduct do not constitute "protected activity" because they are the result of "sham" investigations.

32

Applying the test articulated in *Park*, we conclude that the defendants' conduct underlying the defamation allegation in Laker's retaliation claim arises from protected activity. (§ 425.16, subd. (b).) Just as in *Okorie*, protected speech forms the basis of the defamation allegation in Laker's retaliation claim. The defamatory statements were explicitly alleged to be the "injury-producing conduct." (*Okorie*, *supra*, 14 Cal.App.5th at p. 593.) Therefore, Laker's allegation that the University retaliated against him by defaming him is "subject to section 425.16." (*Sheley*, *supra*, 9 Cal.App.5th at p. 1170.) With respect to this aspect of Laker's retaliation claim, the University has met the prima facie test required by the anti-SLAPP statute, and the trial court erred in its finding to the contrary.[21]

Turning to the second step of the anti-SLAPP analysis, we review whether Laker has shown that he has a probability of prevailing on his retaliation claim based on the defamatory statements. In cases such as this where there are allegations of "both protected and unprotected activity, the plaintiff is required to establish a probability of prevailing on any claim for relief based on allegations of protected activity. Unless the plaintiff can do so, the claim and its corresponding allegations must be stricken.*"* (*Baral*, *supra*, 1 Cal.5th at p. 395.) We conclude that Laker cannot meet his burden. As discussed above, the defamatory statements at issue in his retaliation claim are the same as those in his defamation claim, which we have already concluded are protected by the absolute privilege set forth in Civil Code section 47, subdivision (b)(3). Accordingly, we reverse the trial court's order denying the University's motion to strike the retaliation claim, but only as to the allegation in that claim relating to defamatory statements.

---

[21] We note that the University moved to strike the retaliation claim in its entirety, rather than alternatively arguing that the specific allegations related to defamation in its retaliation claim should be stricken, as it could have done. (*Baral*, *supra*, 1 Cal.5th at p. 393.) In a footnote in its opening brief, however, the University argues that the defamatory statements in the retaliation claim were also protected for the same reasons as argued in the context of the defamation claim. We therefore conclude that the University has not waived its challenge to this aspect of Laker's retaliation claim.

D.  *Attorney's Fees*

The University and McVey argue they are entitled to attorney's fees and costs as prevailing parties on their anti-SLAPP motion.  (§ 425.16, subd. (c)(1).)  Laker has not requested fees or costs under this provision.  Subdivision (c)(1) of section 425.16 provides in relevant part, "in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs."  (§ 425.16(c)(1).)  "A defendant that successfully moves to strike a plaintiff's cause of action, whether on merits or non-merits grounds, has 'prevailed' on the motion, and therefore is entitled to attorney's fees and costs."  (*Barry*, *supra*, 2 Cal.5th at p. 327.)

"A 'prevailing defendant' within the meaning of [the statute] includes a defendant whose anti-SLAPP motion was granted as to some causes of action but not others." (*Area 51*, *supra*, 20 Cal.App.5th at p. 605, citations omitted.)  McVey is a prevailing party on the only cause of action alleged against her, while the University has prevailed in part.  Both McVey and the University, therefore, are prevailing parties under section 425.16, subdivision (c)(1), although the University is not entitled to fees and costs incurred in moving to strike the claim on which it did not prevail.  (*ComputerXpress*, *Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020 (*ComputerXpress*).)  On remand, the trial court should determine the appropriate amount of attorney's fees and costs to which McVey and the University are entitled upon a proper application by defendants.  (See *Area 51*, *supra*, 20 Cal.App.5th at p. 605; *ComputerXpress*, *supra*, 93 Cal.App.4th at p. 1020.)[22]

---

[22] Laker has sought sanctions against McVey and the University for filing a "frivolous" appeal.  Because the defendants' appeal was not frivolous, we deny his motion.  The University filed a motion to strike portions of Laker's brief along with two exhibits consisting of two e-mails, and also requested sanctions on appeal.  We deny the University's motion to strike and request for sanctions, as the University and McVey do not dispute the trial court reviewed at least a redacted version of these e-mails.  However, we note that we have not considered these two exhibits in reaching our decision in this

### III.  DISPOSITION

The trial court's order denying the University and McVey's motion to strike under Code of Civil Procedure section 425.16 is reversed.  On remand, the trial court is directed to vacate its order denying the motion to strike and to enter a new order:  1) granting the motion as to Laker's first cause of action; 2) striking the following language and the claims it supports from paragraph 90 in Laker's second cause of action:  "publishing false and defamatory statements about Laker to punish him for his ongoing efforts to protect SJSU students from sexual harassment by Aptekar, with the intent of scapegoating Laker as the person who had failed to report Aptekar's misconduct"; and 3) denying the motion as to Laker's second cause of action, as modified.

The University and McVey are entitled to attorney's fees on their motion to strike. On remand, the trial court shall determine the amount of attorney's fees and costs incurred in successfully striking the first cause of action and a portion of the second cause of action.

---

appeal.  Although Laker contends that these emails supply evidence of illegality under *Flatley,* 39 Cal.4th 299, the parties' references to them show significant disagreement about them.  Therefore, they would not support the inapplicability of the anti-SLAPP statute under *Flatley*.

_____
DANNER, J.

WE CONCUR:

_____
GREENWOOD, P.J.

_____
GROVER, J.

*Laker v. Board of Trustees of the California State University et al.*
**H044836**

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 17CV307336 |
| --- | --- |
| Trial Judge: | Hon. Theodore C. Zayner |
| Counsel for Defendants and<br>Appellants: | Sarju Anil Naran, Hoge, Fenton, Jones<br>& Appel, Inc.; Anne Marie Grignon<br>Grignon Law Firm, LLP |
| Counsel for Plaintiff and Respondent: | Stanley R. Apps |
| Amicus Curiae on Behalf of Plaintiff<br>and Respondent: | Joseph T. Francke, Californians Aware;<br>Steven J. Andre |

*Laker v. Board of Trustees of the California State University et al.*
**H044836**