Filed 2/10/23  Groth v. Park III Condominimum Homeowners etc. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAKOB GROTH et al.,<br><br>    Cross-complainants and Respondents,<br><br>    v.<br><br>PARK III CONDOMINIMUM HOMEOWNERS ASSOCIATION, INC., et al.,<br><br>    Cross-defendants and Appellants. | D079501<br><br><br><br>(Super. Ct. No. 37-2021-00001534-CU-CO-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Murphy, Pearson, Bradley & Feeney, Jeff C. Hsu, and Patrick A. Gillespie, for Cross-defendant and Appellant Park III Condominium Homeowners Association, Inc.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Garth N. Ward, and Daniel R. Velladao, for Cross-defendant and Appellant Cheryl Snook.

No appearance for Respondents.

In January 2021, Park III Homeowners Association (Park III) sued Gordon Dunn, Jakob Groth, and Groth's spouse Ali Aschoff for breach of the common interest community's governing documents and nuisance, seeking declaratory relief. Groth, Aschoff, and their resident Michael Kirton filed a cross-complaint, against Cheryl Snook and Park III alleging causes of action for violations of the federal Fair Housing Act (FHA), the California Fair Employment and Housing Act (FEHA), and the California Unruh Civil Rights Act, for defamation, and for intentional infliction of emotional distress (IIED). Snook and Park III filed separate anti-SLAPP motions, special motions to strike (Civ. Proc. Code,[1] § 425.16).[2] The court denied the motions. Snook and Park III appealed.

Snook and Park III contend that Groth, Aschoff, and Kirton (the cross-complainants) failed to establish a reasonable probability of prevailing on the merits. We disagree and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

*The Underlying Events*

In January 2015, vandalism began occurring in public spaces around the community. This eventually included a series of written and spray-

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

[2] Section 425.16 is commonly referred to as the anti-SLAPP statute because a special motion thereunder seeks to strike a " '[s]trategic lawsuit against public participation,' " or SLAPP. (*Wilson v. Cable News Network, Inc.* (2019) 7 cal.5th 871, 882, fn. 1 (*Wilson*).)

painted statements that targeted Snook by name,[3] which Snook reported to police. In Snook's statements to police, she accused Dunn, Groth, and Kirton of causing the damage.

In 2018, Snook filed complaints with the Department of Fair Employment and Housing (DFEH) against Park III, Groth, and Dunn, alleging sexual harassment based on the vandalism; she named Groth and Dunn as the vandals.

On April 20, 2019, April 29, 2019, and January 18, 2020, letters were disseminated throughout the community and posted to social media. The letters included Snook's name on the signature line. Some also had a signature. They contained disparaging and offensive comments about people of color and people of foreign descent. Snook denied authoring the offending letters. She reported them to the police, her representative on city council, and the United States Postal Service.

On May 23, 2019, the Park III board unanimously decided "not to take enforcement" against Snook regarding the April 2019 letters because it determined that "there was concrete evidence that [Snook] did not prepare or post the notice or letter."

Around July 24, 2020, Snook filed a petition for a temporary restraining order (TRO) against Kirton.

---

3      The vandals spray-painted statements, including "Cheryl Snook wer'e [sic] gonna rape you," Cheryl Snook we're waiting for you cunt," "Cheryl Snook wer'e [sic] waiting for you to get raped," "Cheryl Snook get out you twat," "Snook leave," "Cheryl Snook get the fuck out of here twat," "Snook leave you cunt," "Listen u cunt Cheryl Snook must go," "Leave Snook twat," "Snook get out," "Merry xmas Cheryl Snook racist cunt [with a crudely drawn penis below it]," "Cheryl a racist Steve Graham is a pedophile," "Cheryl Snook get out now you racist biiyatch," "Snook is a racist bitch."

In September 2020, an attorney for Park III sent a cease-and-desist letter to Groth and Aschoff alleging that Kirton had interfered with Park III's enforcement of its rules and regulations.

*Complaint*

On January 13, 2021, Park III sued Groth, Aschoff, and Dunn for breach of governing documents and nuisance, seeking declaratory relief.

*Cross-complaint*

On January 29, 2021, Groth, Aschoff, and Kirton filed a cross-complaint against Park III and Snook. The cross-complaint explained that Groth is of Polish descent, and Kirton is African-American.[4]

It alleged eight causes of action: (1) violation of the FHA, (2) violation of FEHA, (3) violation of Unruh Civil Rights Act (against Park III only), (4) defamation, (5) breach of quiet enjoyment, (6) private nuisance, (7) IIED, and (8) negligence.[5] It also alleged that all cross-defendants were the agents, servants, employees, and joint venturers of each of the other cross-defendants, and at all times they acted within the course and scope of that agency, employment and joint venture, knowingly accepting and ratifying the acts and omissions of each of the other cross-defendants.

The cross-complaint further alleged that in 2017 Snook falsely accused Groth of writing profane statements in common areas.[6] It alleged that in

---

[4]     The cross-complaint is silent about Aschoff's race or national origin.

[5]     The cross-complainants voluntarily dismissed the fifth, sixth, and eighth causes of action against Snook.

[6]     The cross-complaint alleged that Snook accused Groth of writing "CHERYL SNOOK LOVES ANAL," "CHERYL SNOOK LOVES SUCKING COCK," and "SNOOK'S A BITCH."

2018 Snook falsely accused Groth of spray painting obscene and harassing statements targeting Snook.[7]  It also alleged that, in September 2020, Park III falsely accused Groth and Aschoff's tenant Kirton of harassing Park III board member, Alla Rabinovich.

The cross-complaint alleged that Snook, on behalf of Park III as its president, created and disseminated three letters to Park III community residents, on April 20, 2019, April 29, 2019, and January 18, 2020.  The April 20 letter "ma[de] derogatory statements about Hispanics and Blacks" indicating "that there was a need to limit people of color living in the Park III community."  The April 29 letter "target[ed] African-American and Hispanic residents stating that African-American and Hispanic residents were responsible for serious crime in the area including but not limited to graffiti, attempted break-ins and vehicle damage."  The January 18, 2020 letter stated, "that problems at the Park III community were being caused by people of color and those of foreign descent."  The letter also said Groth was being monitored, "falsely accused [Groth] of attempting to break into [Snook's] residence at Christmas time in 2017," and "falsely accused [Kirton] of being responsible for vehicle damage to a Park III's Board member's vehicle."

The cross-complaint alleged that in December 2018, Snook filed a complaint with the DFEH falsely claiming she was subjected to a threat of

---

7    The cross-complaint alleged Snook attributed the following graffitied statements to Groth:  "CHERYL SNOOK LOVES JUICY BLACK COCK" on an end wall, "CHERYL SNOOK IS GOING TO DIE" on a dumpster, and "CHERYL SNOOK WE ARE GONNA ASS RAPE YOU" on an end wall, "CHERYL SNOOK WE ARE WAITING FOR YOU CUNT" on a dumpster, "CHERYL SNOOK WE ARE WAITING FOR YOU TO GET RAPED" on an end wall, "CHERYL SNOOK GET THE FUCK OUT OF HERE TWAT," "CHERYL SNOOK GET OUT YOU TWAT," and "SNOOK LEAVE."

violence by Groth due to her sex, and it stated that she sought a TRO against Kirton in July 2020. It further alleged that in September 2020, a law firm sent Groth and Aschoff a cease-and-desist letter that accused Kirton of interfering with the enforcement of Park III rules and regulations, including threatening Snook by shouting, "Black lives matter." The cross-complaint stated that the cease-and-desist letter was incomplete because it omitted that Snook called Kirton the "N"-word.

As to the FHA, FEHA, and Unruh Civil Rights Act causes of action, the cross-complaint alleged Snook and Park III created and disseminated letters to the Park III community, which stated that people of color and of foreign descent needed to leave the community and were responsible for graffiti, attempted break-ins, and vehicle damage in the community. They also alleged that Snook and Park III "participated in the selective enforcement of Park III's Declaration of Covenants, Conditions and Restrictions [(CC&R's)] and the rules and regulations of the Park III community specifically targeting [c]ross-[c]omplainants on the basis of their national origin/race," and that Snook and Park III's harassment was designed to intimidate the cross-complainants. The cross-complaint alleged that Snook and Park III's conduct interfered with the use or enjoyment of their residence, and that the discriminatory conduct has caused them to become "mentally upset, distressed, and aggravated."

It explained that "the creation and dissemination of baseless and unwarranted letters attacking [the cross-complainants'] character and national origin/race" was "intentional, extreme, outrageous," and "done with the intent to cause emotional distress," and that the cross-complainants suffered "severe emotional distress, shock and highly unpleasant emotions."

6

*The Anti-SLAPP Motions*

Snook and Park III filed separate anti-SLAPP motions.

Snook argued in her anti-SLAPP motion that all her conduct arose out of protected activity because the communications regarded incidents within the community and were directly connected to reports to police or regarded enforcement of an HOA governing document. She also argued the cross-complaint arose out of speech connected to a public matter protected by section 425.16, subdivision (e)(4). Finally, she argued that her DFEH and civil harassment complaints were privileged under Civil Code section 47, subdivision (b).

Park III argued in its anti-SLAPP motion that the communications concerned an issue of public interest, the governance of the Park III community. Park III also contended that its conduct was protected activity under section 425.16, subdivision (e)(2) because it "sent notices to [c]ross-[c]omplainants[ ] for legitimate, non-discriminatory violations of the Association's Governing Documents including maintaining multiple security cameras on their patio in violation of Section II(K) of the Rules as well as the CC&R's for altering or affixing devices to common areas. . . . These policies and procedures are the same for all Association members and demonstrate that the violation notices were not discriminatory, arbitrary, or capricious. . . . Further, the violation notices were not issued based upon [c]ross-[c]omplainants' race."

Park III also argued that Snook's DFEH complaint, her request for a TRO against Kirton, and the HOA's cease-and-desist letter were privileged under Civil Code section 47 and so constituted protected activity.

As to the second prong of the anti-SLAPP statute, Snook and Park III contended that the HOA directors acted in good faith and within the scope of

7

their duties to investigate and prevent further fraudulent letters from being distributed; thus, their decisions were shielded from liability because of judicial deference given to HOA boards (see *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 265 (*Lamden*)) and because of the business judgment rule (Corp. Code, § 7231).

Park III further argued that because Snook's DFEH complaint, statements made in connection with her request for TRO and the cease-and-desist letter were privileged, the cross-complainants could not demonstrate a probability of prevailing on claims based on that conduct. It also contended that the cross-complainants could not demonstrate that the HOA had acted in an outrageous manner or that its conduct was with the intent to cause emotional distress.

Park III attached declarations to their moving papers. In one, Michelle Steinbock, a Pernicano Realty & Management (Pernicano) employee, affirmed that the HOA did not enforce the CC&R's against the cross-complainants arbitrarily or based upon race or national origin. She stated that Park III's detailed procedures were followed for each of the cross-complainants' violations. HOA board member Rabinovich asserted the same information in her declaration. In Snook's declaration, she asserted that she had never selectively enforced the HOA's governing documents, and specifically that she had never enforced them based on race or national origin.

In their opposition to Park III's motion, the cross-complainants challenged whether the statements at issue constituted "public interest." They also submitted declarations by Groth and Kirton and filed a request for judicial notice of declarations by Derek Edwards, Catie Contreras, and Rebekah Mainor, which had been filed in a related matter, *Mainor v. Park III*

8

*Condominium et al.*, San Diego Superior Court case No. 37-2020-0002875-CU-CR-CTL. Edwards's declaration stated that he had observed Snook selectively enforcing the CC&R's and distributing letters to the community by placing them on vehicles and posting them in the laundry room. Contreras, who had been employed as community manager, also stated that Snook directed her to selectively enforce the community's CC&R's.

Snook and Park III filed objections to the cross-complainants' request for judicial notice and other evidence.

*Anti-SLAPP Order*

The court found that the first prong of the anti-SLAPP statute was met because "Snook's statements and enforcement activities concern issues relating to crime in the 272-member homeowner's association community . . . ." It also found that Snook's reports to police, filing of a DFEH complaint, and her request for a civil harassment restraining order were likewise protected activities.

Addressing the second prong, the court found the evidence was sufficient to satisfy the cross-complainants' burden. The court acknowledged the parties offered contradictory evidence, but it noted it was "duty bound to accept as true in ruling on Snook's anti-SLAPP motion" the evidence offered by the cross-complainants. It also concluded that because the cross-complainants alleged Snook engaged in willful misconduct, the qualified immunity offered by section 425.15 was not available to Snook. It explained that statements contained in a DFEH complaint are protected by the litigation privilege (Civ. Code, § 47, subd. (b)), but the protection did not extend to defamatory statements contained in the notices disseminated to the various homeowners or "Snook's use of a racial epithet with Kirton, whom she called the " 'N-word.' " Although the court acknowledged that Snook

9

denied authoring the disparaging notices, because there was conflicting evidence that the court was required to accept as true, the cross-complainants met their burden. The court denied the anti-SLAPP motions.

Snook and Park III timely appealed.

## DISCUSSION

### I. Anti-SLAPP Law and Standard of Review

"[T]he anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson, supra,* 7 Cal.5th at pp. 883-884.)

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.) "But the plaintiff's second-step burden is a limited one. The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit' [citation]. At this stage, ' "[t]he court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's

10

showing only to determine if it defeats the plaintiff's claim as a matter of law." ' " (*Wilson, supra,* 7 Cal.5th at p. 891.)

On appeal, we examine without deference an order granting or denying an anti-SLAPP motion to strike. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) We accept the cross-complainants' evidence as true. (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*).) We neither weigh credibility nor compare the weight of the evidence. (*Flatley*, at p. 326.) In doing so, we conduct " 'an independent review of the entire record.' " (*Roche v. Hyde* (2020) 51 Cal.App.5th 757, 787.) We exercise our discretion to examine all of the evidence the parties presented to determine if prima facie evidence supports the plaintiffs' contentions. (§ 425.16, subd. (b)(2).)

## II. Applicable Law Regarding Causes of Action

The court concluded Snook and Park III met their burden under the first prong of the anti-SLAPP statute. The cross-complainants did not file an appeal challenging this conclusion or file a respondents' brief. Thus, we need not discuss this prong. We focus our analysis on the second prong and consider whether the cross-complainants demonstrated minimal merit.

### A. *Applicable Law Regarding the FHA Claim*

Federal law prohibits discrimination in the sale or rental of a dwelling to a person based on the person's race, color, or national origin, among other protected classes. (42 U.S.C. § 3604(a).) It also prohibits discriminating against any person in the terms, conditions, or privileges of sale or rental of a dwelling because of race, color, or national origin. (*Id.*, § 3604(b).) Further, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the

11

exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806 [3603, 3604, 3605, or 3606]" of this title. (*Id.*, § 3617.)

A plaintiff can raise an FHA claim under either a disparate-impact or a disparate-treatment theory of liability. (See *Wright v. National Archives & Records Service* (4th Cir. 1979) 609 F.2d 702, 711.) Under the disparate-impact theory, the plaintiff must also demonstrate a causal connection between the defendant's policy and the statistical disparity. (*Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.* (2015) 576 U.S. 519, 524.) Under a disparate-treatment theory of liability, a " 'plaintiff must establish that the defendant had a discriminatory intent or motive.' " (*Ibid.*) A plaintiff is not required to elect the applicable theory at the pretrial, trial, or appellate stages of litigation. (*Wright*, at p. 711.)

### B. *Applicable Law Regarding the FEHA Claim*

California's FEHA prohibits the owner of any housing accommodation to discriminate against or harass any person based on race, color, or national origin, among other protected classes. (Gov. Code, § 12955, subd. (a).) It also prohibits owners of housing accommodations from harassing, evicting, or otherwise discriminating against a person in the rental of housing accommodations when the owner's dominant purpose is retaliation against a person who has opposed unlawful discriminatory or harassing practices. (*Id.*, subd. (f).) The law further prohibits any person from aiding, abetting, inciting, compelling, or coercing such discrimination or harassment. (*Id.*, subd. (g).)

"Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) In analyzing FEHA discrimination claims, including

12

national origin discrimination, "California courts have long used the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792." (A*rnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 424; see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2; *Guz*, at p. 354.)

"This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra*, 24 Cal.4th at p. 354.)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class . . . . While the plaintiff's prima facie burden is 'not onerous' [citation], he [or she] must at least show ' "actions taken by the [defendant] from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .' [Citation.] " [Citation.]' " (*Guz, supra*, 24 Cal.4th at pp. 354-355.) "If, at trial, the plaintiff establishes a prima facie case, a [rebuttable] presumption of discrimination arises." (*Id*. at p. 355.) The burden then shifts to the defendant to show that its action was motivated by legitimate, nondiscriminatory reasons. (*Id*. at pp. 355-356.) A reason is " 'legitimate' " if it is "*facially unrelated to prohibited bias*, and which if true, would thus preclude a finding *of discrimination*." (*Id*. at p. 358.) If the defendant meets this burden, the plaintiff then must show that the defendant's reasons are

13

pretexts for discrimination, or produce other evidence of intentional discrimination.  (*Id*. at p. 356.)

C.  *Applicable Law Regarding Unruh Civil Rights Act*

The purpose of Unruh Civil Rights Act is to "create and preserve 'a nondiscriminatory environment in California business establishments by "banishing" or "eradicating" arbitrary, invidious discrimination by such establishments.' " (*White v. Square, Inc.* (2019) 7 Cal.5th 1019, 1025 (*White*), quoting *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167; Civ. Code, § 51.)  " 'The Act stands as a bulwark protecting each person's inherent right to "full and equal" access to "all business establishments." ' " (*White*, at p. 1025.)

Civil Code section 51, subdivision (b), states:  "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Civil Code section 52, subdivision (a), provides:  "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 . . . is liable for each and every offense for the actual damages, and any amount that may be determined by a jury."

D.  *Applicable Law Regarding Defamation*

" ' "The elements of a defamation claim are (1) publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." ' " (*Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 763.)

14

E. *Applicable Law Regarding IIED*

"The elements of the tort of intentional infliction of emotional distress are: ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . ." ' " (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) "To be outrageous, the defendant's conduct must be either intentional or reckless, and it must be so extreme as to exceed all bounds of decency in a civilized community." (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1045 (*Spinks*).) Whether conduct is outrageous is usually a question of fact. (*Ibid*.) Courts have found that acts manifesting racial animus can constitute outrageous conduct in some circumstances. (See, e.g., *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946-947 [racial slur], disapproved of on other grounds in *White v. Ultramar, Inc.* (1991) 21 Cal.4th 563; *Robinson v. Hewlett-Packard* (1986) 183 Cal.App.3d 1108, 1128-1130 [same].)

III. Evidentiary Objections

Snook and Park III contend the cross-complainants cannot demonstrate a probability of success because they have not stated a legally sufficient claim. Snook and Park III make this claim by attacking the admissibility and quality of the evidence.

A. *Authorship of the Letters*

Snook contends that she did not author the written communications that were disseminated throughout the community. She explains that some letters did not contain her signature and others contain a forged signature. Park III contends Snook's conduct of seeking help from the San Diego City

15

Council, the San Diego Mayor's Office, and the United States Postal Office to help identify the author of the letters was inconsistent with her actually authoring them. Ultimately, Park III argues that "if the SDPD and USPS have not been able to identify the culprit responsible for the Letters, there are no facts or evidence which [ ] can be put forward by the Respondents to overcome the presumption that the Association acted reasonably with respect to their investigation and efforts to prevent further incidents." In essence, they contend evidentiary obstacles preclude consideration of the written communications.

However, "[t]o strike a complaint for failure to meet evidentiary obstacles that may be overcome at trial would not serve the SLAPP Act's protective purposes. Ultimately, the SLAPP Act was 'intended to end meritless SLAPP suits early without great cost to the target' [citation], *not* to abort potentially meritorious claims due to a lack of discovery." (*Sweetwater*, *supra*, 6 Cal.5th at p. 949.) Although a trial court may decline to consider submitted evidence in response to an anti-SLAPP motion when the evidence "*cannot* be admitted at trial, because it is categorically barred or undisputed factual circumstances show inadmissibility" (*ibid*), neither condition applies here. The letters are not categorically barred, and there are disputed facts about whether Snook authored them. Snook and Park III's "argument runs ahead of itself and accordingly fails. . . . evidence may be considered at the anti-SLAPP motion stage if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial." (*Id*. at pp. 946-947.)

Although the issue of who wrote and disseminated the letters will be a central factual question at trial, proof of their authorship is not required at

16

this stage of litigation. We express no opinion regarding the admissibility of the declarations in a different context or at a different proceeding.

B. *Judicial Notice of Declarations*

In their opposition to the anti-SLAPP motions, the cross-complainants requested judicial notice of three declarations submitted in related litigation. Snook and Park III objected. The trial court overruled the objections, distinguishing judicially-noticed documents from declarations signed under penalty of perjury. It concluded the additional declarations were no different in type or substance than the declarations submitted directly in the pending proceeding and admitted the evidence. In the minute order, the court referenced Derek Edwards's declaration,[8] explaining that it provided evidence "regarding prior instances of selective enforcement and distribution of letters by Snook."

On appeal, Park III repeats its objection to the evidence contained within the request for judicial notice, arguing that the court could take judicial notice of the declarations' existence but not of the truth of the matters asserted therein.[9] Quoting *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113, Park III argues that the truthfulness and proper interpretation of a document for which judicial notice is granted is disputable.

In the context of an anti-SLAPP motion where the court was considering evidentiary claims to evaluate the probability of success on the

---

[8] The minute order appears to mistake the name Derek Johnson for Derek Edwards. There is no declaration by Derek Johnson; however, the declaration by Derek Edwards addresses the substance identified by the court's minute order.

[9] Snook does not challenge this evidence in her opening brief.

17

merits, its decision to consider a declaration signed under penalty of perjury was not erroneous. We observe that rather than provide such evidence through judicial notice, the cross-complainants could have simply submitted the evidence directly in connection with their oppositions to the anti-SLAPP motions, and that may have been preferrable. However, we decline to disregard the contents of the declarations here based on the notion that form should govern over substance in this situation.

Separately, Park III argues that because the cross-complainants did not explicitly reference Contreras's or Mainor's declarations in their written opposition, those statements offer no evidence to demonstrate a probability of prevailing. While we do not believe the evidence contained in those declarations is necessary, we note that the statements in those declarations do support the cross-complainants' claims. Contreras's declaration states that when she was the community manager, Snook accompanied her on inspections of the community, and Snook selectively chose which residents to send notice of violations. This supports the cross-complainants' claim that the HOA engaged in selective enforcement practices.

Mainor's declaration likewise recounts selective enforcement of CC&R's. Mainor, an African-American female who rented a unit in the community, identified incidents in which she received notice of violating the CC&R's where there had been no violations. She also explained that a board member had surveillance cameras monitoring her home, but when she installed cameras on her patio umbrella after receiving permission from the unit's owner, the HOA board issued a notice of violation for her cameras. These statements, if accepted as true, support the cross-complainants' allegations regarding race-based, selective enforcement of the CC&R's.

On appeal, Snook does not repeat her objection to the court's consideration of the judicially noticed declarations or otherwise directly challenge them. Instead, she contends that the statements contained within the declarations do not provide evidence of selective enforcement due to racial animus. As we have detailed, we disagree.

C. *Evidence Code Section 1101*

Snook and Park III contend Kirton's declaration constitutes inadmissible character evidence. Park III makes the same challenge to Edwards's declaration.

Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact[, ] (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . )." Under that statute, and in the FEHA context, California Courts of Appeal have allowed admission of so-called "me-too" evidence to show intent or motive for the purpose of casting doubt on a defendant's stated reason for an adverse action against the plaintiff. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 92 [defining " 'me-too' " evidence as that tending to show a defendant's alleged discrimination in the form of harassing activity against individuals other than the plaintiff, outside plaintiff's presence]; accord *Meeks v. Autozone, Inc.* (2018) 24 Cal.App.5th 855, 871 ["California courts have held so-called 'me-too' evidence, that is, evidence of gender bias against employees other than the plaintiff, may be admissible evidence in discrimination and harassment cases"].)

Kirton's declaration serves a similar purpose. He explains that the letter blaming Blacks and Hispanics for serious crime was signed by Snook. He notes that a second letter directly accused him of causing vehicle damage

19

and stated that people of color were problem residents. He describes Snook's conduct in photographing a vehicle of another African-American resident, followed by her harshly telling him "I am gonna get you next" and calling him the "N" word. Taken together, these statements imply that Snook targeted African-American residents.

We note that the cross-complainants' burden is limited; they do not need to prove their case to the court. They merely need to demonstrate there is "minimal merit" to their claims. (*Wilson*, *supra*, 7 Cal.5th at pp. 890-891.) At this stage, we do not weigh evidence or resolve conflicts; we simply consider whether the cross-complainant has stated a legally sufficient claim and made a prima facie factual showing. We evaluate Snook and Park III's showing " ' "only to determine if it defeats the plaintiff's claim as a matter of law." ' [Citation.]" (*Id.* at p. 891.) We do not opine whether the challenged declarations would be admissible in a different context. We simply conclude that in this anti-SLAPP context, the Evidence Code section 1101 challenges do not defeat the cross-complainants' allegations as a matter of law.

### D. *Litigation Privilege*

Snook and Park III contend that statements Snook made in connection with her DFEH complaint and her request for a TRO are protected by Civil Code section 47, subdivision (b), the litigation privilege. Snook also contends that her communications to police are protected by the litigation privilege. Park III further contends that the cease-and-desist letter sent by an attorney on behalf of the HOA board falls within the litigation privilege, and that Groth's allegations concerning Snook's statements fall within that privilege.

The Supreme Court has interpreted the litigation privilege to prevent any secondary suit raised solely from communications related to any proceeding authorized by law. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1196-

20

1198.)  The privilege applies to statements, communications, court filings, and other communications outside the confines of a proceeding when "required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation."  (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)

The litigation privilege appears to bar allegations that rely on the civil harassment complaint, the DFEH complaint, and the cease-and-desist letter. We do not direct those allegations be stricken because they may provide evidentiary value for the remaining claims.  However, we express no opinion regarding whether this evidence would be admissible or survive a litigation challenge in a future proceeding or different context.

## IV.  Substantive Claims

The gravamen of Snook's and Park III's arguments on appeal is that the cross-complainants do not offer sufficient evidence to meet their prima facie burden.  In addition to challenging the admissibility of the cross-complainants' evidence, Snook and Park III also challenge the substance of the evidence.

### A. *FHA, FEHA, and Unruh Civil Rights Act Causes of Action*

Snook contends her decisions to enforce the HOA rules and regulations falls within the business judgment rule and the doctrine of judicial deference. She and Park III argue that the citations issued to cross-complainants were based on observable violations of the CC&R's.

They also challenge the substance of the declarations.  They contend that the declarations do not describe activity by Snook to support the claim that she authored the offending letters, that Groth's declaration is self-serving and speculative, and that Edwards's, Contreras's, and Mainor's declarations fail to prove there was selective enforcement of the CC&R's based on unlawful bias.

21

The business judgment rule protects directors from personal liability when they make decisions that result in damage or loss to another as long as those decisions were made in good faith, consistent with the inquiry an ordinary, prudent person would make, believed to be in the best interest of the HOA. (See Corp. Code, § 7231, subd. (a).) Moreover, the rule applying judicial deference to homeowner associations requires the decisions to represent good faith efforts to further the purpose of the common interest development, to be consistent with the community's governing documents, and to comply with public policy. (*Watts v. Oak Shores Community Assn.* (2015) 235 Cal.App.4th 466, 473, discussing *Lamden*, *supra*, 21 Cal.4th at p. 265; see *Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 754-755.) These defenses do not create blanket immunity for all decisions or actions of homeowners associations.

Moreover, as we explained *ante*, we may consider inferences as well as direct evidence to determine whether there is prima facie evidence of the cross-complainants' claims. "[T]he proper inquiry in the context of an anti-SLAPP motion 'is whether the plaintiff proffers sufficient evidence for such an inference.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 822; followed in *Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings, Inc.* (2019) 36 Cal.App.5th 766, 781.) Indeed, " 'to satisfy due process, the burden placed on the plaintiff must be compatible with the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery . . . .' " (*Hardin v. PDX, Inc.* (2014) 227 Cal.App.4th 159, 166; see *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 530 ["We are inclined to allow the plaintiff in a [special motion to strike] a certain degree of leeway in establishing a

22

probability of prevailing on its claims due to 'the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery' "].)

The declarations recount instances of selective enforcement of violations generally, enforcement of violations against African-American residents, negative interactions with African-American residents that included the use of a racial slur, and letters that targeted residents of color and those of foreign descent attributable to Snook on behalf of the HOA. We conclude that, considered together, the declarations allow a trier of fact to draw sufficient inferences to support the cross-complainants' claims. (See *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 ["[t]he 'burden of establishing a probability of prevailing is not high' "]; *Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 363-364, [same].)

Moreover, the cross-complainants' claims of racial animus and willful misconduct are not compatible with the good faith requirement of the business judgment rule and the doctrine of judicial deference. Although Snook and Park III contend that they acted reasonably and in good faith, citing to their efforts to determine who authored and disseminated the communications, the cross-complainants' evidence contradicts those claims. Snook and Park III have not shown that application of these doctrines would, as a matter of law, defeat the cross-complaint claims. At most, they create factual disputes for a trier of fact to resolve.

## B. *Defamation Cause of Action*

Snook contends that the cross-complainants cannot show a probability of success on the defamation claim because the allegations giving rise to it are absolutely privileged.

Although Snook appears to concede that at least one of the letters is a publication that could give rise to a defamation cause of action, she maintains that there is not sufficient evidence that she authored the letters, so any defamatory statements cannot properly be attributed to her. This argument does not overcome the evidence offered by the cross-complainants.

We observe that not all the communications were raised in the context of litigation or other official proceedings, and as we explained *ante*, the issue of authorship is a factual one. We cannot say, as a matter of law, that Snook did not author the offending and non-litigation-oriented communications. The superior court explained in its minute order, and we agree, that "[w]hile Snook vehemently denies having [authored the communications], permissible inferences from the cross-complainants' proffered evidence, i.e., the content of the notices [ ] themselves; the purported signature of Snook on the notices; the photos of Snook on the notices; cross-complainants' denial of authorship of the notices; Kirton's claim that Snook called him a 'N-word[ ]'; and[ ] the declaration of Derek [Edwards] regarding prior instances of selective enforcement and distribution of letters by Snook, considered collectively, are sufficient to satisfy cross-complainants' minimal Prong II burden of establishing probability of prevailing on their defamation claim."

Park III separately contends that the cross-complainants cannot meet the requirements of a defamation cause of action because there is no evidence Snook's statements, including those made during her verbal confrontation with Kirton, were made on behalf of the HOA. We disagree.

24

Under the doctrine of respondeat superior, Snook's acts are imputed legally to Park III. (See Civ. Code, § 2330.) Snook was the president of the board of directors of the HOA when the alleged conduct occurred. The April 20, 2019 communication identifies her as a resident and also as the board's president. The April 23, 2019 mailed letter to Mainor states that it is the author's "fiduciary duty as board president to protect our community from residents like you and your son," indicating it was written on behalf of the board. The January 18, 2020 mailed correspondence states that Snook is the board president who has been working hard to create a nice community, and it references the other board members as her "team." Below her signature is her title (president) and "Park III Board of Directors." Moreover, the cross-complaint alleges that she acted as an agent of Park III and that Park III knowingly accepted and ratified her conduct. Park III points to no evidence that contradicts these allegations.

Park III points out that it is a named respondent in Snook's DFEH complaint as a reason that Snook's comments cannot be attributed to Park III. However, the content of that complaint addresses only some of the conduct upon which the cross-complainants base their defamation cause of action. Her complaint that the HOA board's inaction resulted in continued harassment is not necessarily inconsistent with the defamation allegations based on other conduct undertaken on behalf of the HOA board.

C. *IIED Cause of Action*

Snook contends there is no evidence that she engaged in extreme and outrageous conduct because she did not draft the letters or engage in any other conduct that intimates racial animus. Park III adds that even

25

assuming Snook authored the communications, this is not evidence of extreme and outrageous conduct.

As we detailed *ante*, the issue of authorship is one of fact. The cross-complainants have introduced evidence that Snook authored the letters, and we must accept that evidence as true at this stage. (*Wilson*, *supra*, 7 Cal.5th at pp. 891-892.) Whether the conduct rises to the level of extreme and outrageous conduct is, similarly, usually a determination made by the trier of fact. (*Spinks*, *supra*, 171 Cal.App.4th at p. 1045.)

### V. Park III's Request for Attorney Fees and Costs

Because we conclude that the court properly denied the anti-SLAPP motions, Park III is not a "prevailing defendant." (Civ. Proc. Code, § 425.16, subd. (c).) Thus, Park III is not entitled to attorney fees or costs.

### DISPOSITION

The order is affirmed. Snook and Park III to bear their own costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

BUCHANAN, J.

26